**UNITED STATES of America, Plaintiff,**

v.

**John HORAK, Defendant.**

**No. 85 CR 373–1.**

United States District Court, N.D. Illinois, E.D.

Feb. 8, 1986.

Order on Forfeiture April 18, 1986.

Joseph Duffy and Ira Raphaelson, Asst. U.S. Attys., Chicago, Ill., for U.S.

Peter F. Vaira, Chicago, Ill., and G. Robert Blakey, Notre Dame Law School, Notre Dame, Ind., for defendant.

### ORDER

NORGLE, District Judge.

This case involves a thirty-eight count superseding indictment against John Ho-rak. Until 1972, Horak was the owner of HOD Disposal. Horak sold HOD to Waste Management in 1972 for over 64,000 shares of Waste stock and "other consideration." Horak, however, remained the manager of HOD as a division of Waste. Richard Hamm is the mayor of the Village of Fox Lake; Richard Gerretsen is a member of its Board of Trustees.

Count I of the indictment charges that Horak paid a $5,000 bribe to Hamm and $5,000 to Gerretsen in connection with the award of a Village garbage contract to HOD. *See* Ill.Rev.Stat. ch. 38 § 33–1(a), (d) & (e). Count I also charges Horak with the bribery of Hamm at various times between 1981 and 1983. Horak allegedly made smaller payments to Hamm, ranging from $100 to $500, totalling $2000. Count I charges the bribery as a violation of 18 U.S.C. § 1962(c).

Count I also asks for the forfeiture of various interests held by Horak under § 1963(a)(1) and (2). The government's theory is that Horak acquired or maintained certain interests by reason of his violation of § 1962(c), thereby making those interests subject to forfeiture under § 1963(a)(1). Alternatively, the indictment charges that Horak maintained certain interests in Waste which afforded him with influence over Waste (an enterprise which he conducted through a pattern of racketeering activity in violation of § 1962(c)), thereby subjecting those interests to forfeiture under § 1963(a)(2). The various interests which the indictment charges are subject to forfeiture are the following: a) all Horak's "positions" with Waste, b) bonuses and salaries paid to Horak from 1981 through 1985, c) Horak's assets in Waste, d) Horak's shares of Waste stock, e) Horak's interests in profit sharing and pension plans.

Count II alleges a scheme to defraud Fox Lake and its citizens by Horak, Hamm and Gerretsen. That count also charges the first of 37 mail fraud counts. The substance of the scheme is that, in return for

bribes, Hamm and Gerretsen would see to it that HOD was awarded a garbage contract even though HOD was not the low bidder for the contract. The scheme allegedly contemplated the mailing of monthly invoices under the contract by HOD and the payment of those invoices by Fox Lake through the mails. Counts 2 through 38 are mail fraud counts predicated on the mailing of checks by Fox Lake for services rendered under the garbage contract. The scheme is alleged to have defrauded Fox Lake and its citizens of the faithful services of Hamm and Gerretsen, the right to have its business conducted without fraud, and the right to have a garbage contract awarded fairly and impartially.

Horak has filed various pretrial motions: 1) a motion to dismiss the indictment, 2) a motion for Rule 6(e) disclosure, 3) a motion for a bill of particulars, 4) a motion to disclose favorable evidence, and 5) a motion in limine regarding the admissibility to co-conspirator statements. Horak's motions are the subject of this Order. The Court addresses each motion in turn.

*I Motion to Dismiss*

18 U.S.C. § 1962(c) makes it unlawful for any person employed by or associated with any enterprise to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering activity. A pattern of racketeering activity is defined by reference to § 1961(1) and (5). Under that section mail fraud (18 U.S.C. § 1341) is a racketeering activity and two acts of mail fraud within ten years of each other (with the first mail fraud occurring after the enactment of § 1961) constitute a "pattern." 18 U.S.C. § 1963 states the penalties for violations of § 1962. Subsection (a) provides for a $25,000 fine or 20 years imprisonment, or both, and a forfeiture to the United States of (1) "any interest ... acquired or maintained in violation of section 1961" in this case, Horak's conduct of an enterprise's (Waste's) affairs through a pattern of racketeering activity, or (2) "any interest in ... or property or contractual right of any kind affording a

source of influence over any enterprise ... operated, controlled [or] conducted in the conduct of in violation of section 1962 (*viz.* through a pattern of racketeering activity)."

Horak mounts three attacks on various parts of the indictment: 1) the mail fraud counts should be dismissed because the charged mailings were not in furtherance of the scheme to defraud, 2) the indictment fails to state a basis for forfeiture of Horak's shares in Waste, and 3) the forfeiture of shares of stock valued at an amount in excess of $4m in relation to the criminal acts charged is so disproportionate a penalty that it violates the 8th Amendment.

*A. Mail Fraud*

Horak characterizes the scheme charged in the indictment as one to "obtain a contract for the disposal services of HOD." Deft's Memo at 4. Consequently, because the scheme came to fruition when HOD obtained the contract, the charged mailings could not have been made in execution or furtherance of the scheme to defraud. *See United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 647, 38 L.Ed.2d 603 (1974). *See also United States v. Galloway,* 664 F.2d 161, 166–68 (CA7 1981) (Swygert, J. dissenting). Horak's second argument is closely related to the first. He contends the charged mailings are not sufficiently closely related to the alleged scheme to defraud because 1) the mailings occurred in the ordinary course of the business of Fox Lake 2) after the object of the fraud had already been achieved. The Court does not agree.

 The test for measuring the sufficiency of the mail fraud counts is whether it is conceivable that the government can introduce evidence at trial which shows the charged mailings were part of the execution of the scheme to defraud. *United States v. Castor,* 558 F.2d 379, 384–85 (CA7 1977). With this standard in mind, the Court believes Horak's characterization of the goal of the charged scheme is too narrow. It makes little sense to exclude the contemplated benefit from the garbage

contract in defining the goal of the scheme charged in the indictment. The contract right for garbage services in Fox Lake was worth little to HOD without the monthly payments for those services. Consequently, it is more likely the contemplated goal of the scheme to defraud was the remuneration for garbage services rather than the making of the contract. Thus, the government may well be able to show the contract was but a mere vehicle to the ultimate goal of compensation. *See, e.g., United States v. Rauhoff,* 525 F.2d 1170, 1176 (CA7 1975). Under such a theory, the charged mailings may have occurred in the execution of the scheme to defraud. *Cf. Galloway,* 664 F.2d at 162–63. Additionally, the government may choose to prove that the charged mailings were the proceeds of the fraudulent scheme. Under such a theory it does not matter that the mailings were perfected and the proceeds were accepted *after* the performance of the acts constituting the scheme to defraud. *See United States v. Castor,* 558 F.2d 379, 385 (CA7 1977); *Rauhoff,* 525 F.2d at 1176; *United States v. Climatemp,* 482 F.Supp. 376, 383 (N.D. Ill.1979). For these reasons Horak's motion to dismiss the mail fraud counts is denied.

### B. Forfeiture

The only object Horak contests in the indictment's request for forfeiture under § 1963(a)(1) and (2) is his interest in shares of Waste stock. Horak does not contest the remaining interests stated in the indictment as subject to forfeiture. Horak insists the language of § 1963(a) simply does not cover the forfeiture of shares which were obtained at least 10 years before the occurrence of the acts charged in the indictment. The government counters with the explanation that subsection (a)(1) contemplates forfeitures of interests which have been *maintained* through a pattern of racketeering activity and blithely asserts that Horak's waste shares were "maintained" during the time of the pattern of racketeering activity charged in the indictment. *See* Gov Memo at 12. The government also points to the possibility of forfeiture under subsection (a)(2). Waste is named as the RICO enterprise in the indictment and HOD is a division of Waste. Based on that subsidiary relationship, the government theorizes that Horak's Waste shares are subject to forfeiture because those shares constituted an interest which afforded Horak with a source of influence over Waste. Gov Memo at 13. The government does not explain the kind or extent of influence Horak had over Waste by reason of his shares of stock. In light of the foregoing, the Court believes it would benefit from oral argument on *these* issues. The matter is set for argument on Monday, February 10, 1985 at 11:30 a.m.

### II Motion for Disclosure Under Fed.R. Crim.P. 6(e)

Horak contends the issuance of a superseding indictment in this case supports his request for access to grand jury materials. According to Horak, a comparison of the original and superseding indictments reveals that the "entire theory of the prosecution changed" although the essential facts charged remained the same. The Court does not agree.

█ Merely because the government chose to pursue a different theory in prosecuting this case does not necessarily compel the conclusion that the grand jury was misled or misused by the government's effort to obtain a superseding indictment. Indeed, the grand jury process has little semblance of balance. The grand jury's function is to determine whether there is probable cause to believe an offense has been committed. *United States v. Gardner,* 516 F.2d 334, 335–36 (CA7 1975). And in presenting his case before the grand jury, the prosecutor need not present all evidence which *might* tend to exculpate a defendant. *See United States v. Dorfman,* 532 F.Supp. 1118, 1133 (N.D.Ill.1981) (prosecutor must present evidence to grand jury which clearly negates defendant's guilt). Moreover, grand jury proceedings are not intended to approximate a trial on the merits. *See Costello v. United States,*

350 U.S. 359, 76 S.Ct. 406, 407, 100 L.Ed. 397 (1956). Thus, little more can be drawn from the bare fact of the return of a superseding indictment in this case than the government's change in the theory of prosecution.

▮ In the absence of improper motive, the government is generally given wide latitude in seeking a superseding indictment. *See, e.g., United States v. Samples,* 713 F.2d 298, 302 (CA7 1983). *See also United States v. Cole,* 755 F.2d 748, 757–58 (CA11 1985). Nevertheless Horak argues that the superseding indictment contains additional mail fraud counts without alleging additional facts. But, as noted above, this reveals little more than the government's change in "theory" in prosecuting this case; a change in theory which the Court has already sustained in part I of this Order.

Finally, Horak points to the apparent disparity between the crime charged and the amount of the forfeiture requested by the government. He insists that such an apparent disparity is "evidence that the grand jury was mislead [sic] as to the causal connection required between the alleged illegal acts and the forfeiture of the stock." Deft's Memo at 3. *See generally United States v. Lizza,* 775 F.2d 492 (CA2 1985). The government's response to Horak's argument is less than convincing. Consequently, the government is ordered to furnish the Court with the transcripts of grand jury proceedings *which deal with the forfeiture* of Horak's shares of Waste stock. The government shall furnish the grand jury transcripts for *in camera* inspection as soon as is practicable; preferably before or at the hearing scheduled for February 10. The Court will examine the transcripts and issue a ruling before trial. *See United States v. Edelson,* 581 F.2d 1290, 1291–92 (CA7 1979).

▮ As an alternative basis for his motion for access to grand jury materials, Horak contends that he has met his burden of showing a particularized need for grand jury transcripts. *See* Fed.R.Crim.P. 6(e)(3)(C)(i). *See generally Douglas Oil v.*

*Petrol Stops Northwest,* 441 U.S. 211, 221, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979). The Court does not agree. Except for the possibility that a particularized need stems from the disparity of the forfeiture of his Waste shares, Horak has done little more than suggest broad generalized desires for access to grand jury materials. Such generalized statements do not constitute "particularized need." *See Douglas Oil,* 441 U.S. at 222, 99 S.Ct. at 1674 (in order to show "particularized need" 1) requested materials must be "necessary to avoid a possible injustice" and 2) the request must be "structured to cover only material so needed"). Accordingly, Horak's motion for access to grand jury materials is denied.

### III Motion for Bill of Particulars

Horak suggests no less than five pages of questions he would like answered in a bill of particulars. Deft's Motion at 1–5. Approximately half of those requests involve potential forfeitures under § 1963(a). *See id.* at 3–4. Horak generally contends that the requested particulars are necessary to defend this case and avoid surprise at trial.

▮ The granting of a bill of particulars rests within the discretion of the trial court. *Wong Tai v. United States,* 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927). Relevant factors in the exercise of that discretion include 1) the complexity of the charged offense, 2) the clarity of the indictment and 3) the degree of discovery available to the defendant without the bill. *United States v. Kendall,* 665 F.2d 126, 135 (CA7 1981).

▮ The indictment in this case is not overly complex. Although not stated with the specificity Horak would like, the violations of federal law and supporting facts are stated with clarity. Additionally, Horak's statement to the FBI makes clear that he is aware of many of the particulars he now seeks. *See* Gov Ex 1 (Horak Statement to FBI). In light of these findings, the Court believes a bill is inappropriate in this case. Horak has a constitutional right

to know the offenses with which he is charged, but he has no right to know how the government intends to go about proving those offenses. *See generally Kendall,* 665 F.2d at 135–36; *United States v. Lavin,* 504 F.Supp. 1356, 1361 (N.D.Ill. 1981). Horak's motion for a bill of particulars is denied.

## IV Motion to Disclose Favorable Evidence

Horak requests an order requiring the government to furnish all exculpatory and witness material in its possession. The government's response to the motion makes clear that the government is aware of its continuing obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and the Jencks Act. The government also offers specific responses to each of Horak's requests. In light of the government's specific response to Horak's requests, Horak's motion is denied. However, he may reassert his motion if he becomes aware of any specific material which he believes he is entitled to view.

## V Motion in Limine Re Co-Conspirator (Co-Schemer) Statements

Although the indictment does not charge a conspiracy (it charges a scheme to defraud among Horak, Hamm and Gerretsen), Horak requests a *Santiago* hearing to determine the admissibility of co-schemer statements as non-hearsay. *See* Fed.R. Evid. 801(d)(2)(E); *United States v. Wormick,* 709 F.2d 454, 461 (CA7 1983) (conspiracy doctrines applicable to multi-member schemes to defraud by mails) *accord United States v. Wilson,* 506 F.2d 1252, 1257 (CA7 1974). Contrary to Horak's insistence, however, the Court finds no need for a *Santiago* hearing in this case. Nor is there a need for a more specific proffer from the government.

Horak's statement to the FBI (a statement which he does not attack in his pretrial motions) and the government's representation that Hamm would corroborate that statement (Hamm is cooperating with the government, *see* Gov Ex 1) establish the existence of a scheme to defraud by Horak, Hamm and Gerretsen from the summer of 1981 to the fall of 1983. The Court is satisfied that the remaining Rule 801(d)(2)(E) determinations can be made at trial (*viz.* declarations made in furtherance of the scheme). *See U.S. v. Santiago,* 582 F.2d 1128, 1131 (CA7 1978).

## VI Conclusion

The Court reserves ruling on the issue of the forfeiture of Horak's shares in Waste under § 1963(a)(1) and (2). The Court will examine the grand jury materials submitted by the government and render a ruling shortly thereafter. Horak's remaining pretrial motions are denied. Oral argument is set for Monday, February 10, 1985 at 11:30 a.m.

IT IS SO ORDERED.

## ORDER ON FORFEITURE

This matter is before the Court for resolution of issues regarding the forfeiture of assets held by the Defendant, John Horak (HORAK). *See* 18 U.S.C. § 1963(a)(1) and (2). Count I of the superseding indictment (issued Feb. 10, 1986) charged Horak with the payment of two $5,000 bribes to public officials in connection with the award of a garbage contract. Additional bribes by Horak (unrelated to the contract award) were also charged in Count I. Those incidents of bribery formed the basis for the charge that Horak violated 18 U.S.C. § 1962(c) by conducting the affairs of an enterprise ("WASTE MANAGEMENT, INC., including its subsidiaries and divisions" (WASTE)) through a pattern of racketeering activity. Not surprisingly, the § 1962(c) violation supported a claim to forfeit various assets held by Horak. The government's forfeiture theories are fairly straightforward: 1) Horak acquired and maintained certain assets by reason of his violation of § 1962(c), thereby subjecting those assets to forfeiture under § 1963(a)(1); 2) Horak has an interest

(stock) in an enterprise (Waste) which he conducted, operated or participated in the conduct of, in violation of § 1962(c), thereby subjecting that asset to forfeiture under § 1963(a)(2). The government seeks forfeiture of four assets: a) Horak's shares of Waste stock, b) Horak's positions with Waste, c) bonuses and salaries paid to Horak by Waste from 1981 through 1985; and d) Horak's interests in Waste profit sharing and pension plans.

The remainder of the indictment is less complex. Count II charges Horak with a scheme to defraud the Village and its citizens of the faithful services of public officials, the right to the fair conduct of Village business and the right to have the garbage contract awarded under a fair process. Count II also contains the first of 36 mail fraud charges. The remaining incidents of mail fraud form separate counts in the artfully drawn indictment.

At trial, the evidence revealed that, prior to 1972, Horak operated HOD Disposal Company. Late in the same year, however, Horak entered negotiations with Waste for the sale of HOD to Waste. The parties reached an agreement and, in return for his interest in HOD, Horak received shares of Waste stock and an agreement of employment installing him as manager of HOD for a period of years. Thus, HOD became a division of Waste. It should be kept in mind that these negotiations and agreements between Horak and Waste took place in late 1972—some nine years before the incidents charged in the indictment.

The jury returned a guilty verdict on all counts. No forfeiture issues were heard at trial. Instead, those issues were reserved for separate consideration in the event the jury found a violation of § 1962(c). *See* Fed.R.Crim.P. 31(e). Thus, upon return of the verdict, the Court prepared to submit the forfeiture issues to the jury. In the interim, however, Horak consulted with his attorney and decided to waive his right to a jury trial on the forfeiture issues. The

parties thereafter stipulated to various facts (regarding Horak's assets) and filed memoranda with the Court. *See* Appendix A. The Court considered those briefs inadequate and requested oral argument on some issues. Another round of briefs followed. The forfeiture issues are now ripe for ruling.

## I Construction of RICO Forfeiture Provisions

■■■■ Any attempt at statutory construction begins with the language of the statute. If the statutory language is clear and unambiguous, then that language should ordinarily be regarded as conclusive. *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). If the statute is ambiguous, however, the Court must turn to the legislative history and attempt to divine Congress' intent in drafting the statute.[1] In arriving at a construction, the Court should attempt to harmonize the policy and purpose behind the statute with the congressional intent. *See CIR v. Engle*, 464 U.S. 206, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984); *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 103 S.Ct. 986, 994, 74 L.Ed.2d 845 (1983). Additionally, in the construction of an ambiguous criminal statute, the Court should apply the rule of lenity. *Bifulco v. United States*, 447 U.S. 381, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980). Finally, in construing § 1963(a) the Court must attempt to arrive at a construction which does not conflict with the Constitution. *See United States v. Clark*, 445 U.S. 23, 100 S.Ct. 895, 899–900, 63 L.Ed.2d 171 (1980).

Section 1963(a) contains two forfeiture provisions. For the sake of convenience the Court refers to the provisions as "(a)(1)" and "(a)(2)." Thus, "[w]hoever violates any provision of section 1962" shall forfeit

(1) any interest he has acquired or maintained in violation of section 1962, and

---

1. It is significant to note (and counsel on both sides agree) that the enactment of RICO carried with it very little legislative debate. The absence of any significant legislative history for so broad a statutory scheme as RICO is odd and inspires this Court to caution.

(2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

Neither party claims subsection (a)(1) is ambiguous, although both parties have different views about its application to the facts in this case. The real contest centers on the meaning of subsection (a)(2) and its application to Horak's shares of Waste stock.

Horak contends each of the four categories of property identified in subsection (a)(2) are modified by the phrase "affording a source of influence over [any enterprise]." Thus, Horak's shares of Waste stock would not be forfeited unless those shares provided him with a means of influencing the conduct of the enterprise (Waste).

The government maintains the comma structure of subsection (a)(2) supports the conclusion that the phrase "affording a source of influence over" any enterprise only modifies the final two categories of property set out in (a)(2) (a "property or contractual right of any kind"). There is support for both positions. *See, e.g., United States v. Cauble,* 706 F.2d 1322, 1348 (CA5 1983); *United States v. Grammatikos,* 633 F.2d 1013, 1034 (CA2 1980); *United States v. L'Hoste,* 609 F.2d 796, 813 (CA5 1980); *United States v. Ragonese,* 607 F.Supp. 649, 652 (S.D.Fla.1985); *United States v. Thevis,* 474 F.Supp. 134, 145 (N.D.Ga.1979); D. Webb & S. Turow, *RICO Forfeiture in Practice: A Prosecutorial Perspective,* 52 U.Cin.L.Rev. 404, 411 (1983); Weiner, *Crime Must not Pay: RICO Criminal Forfeiture in Perspective,* 1 N.IL.U.L.Rev. 225, 254 & n. 113 (1981); Note, *RICO Forfeitures and the Rights of Innocent Third Parties,* 18 *Cal.West.L.*

*Rev.* 345, 353 (1982); Note, *A Proposal to Reform Criminal Forfeiture Under RICO and CCE,* 97 *Harv.L.Rev.* 1929, 1935–37 (1984). None of the authorities cited above offer any meaningful analysis of the issue before this Court (nor have the parties cited any additional authority to the Court)[2]: Did Congress intend to require a connection (a nexus) between a Defendant's underlying violation of § 1962 (racketeering activity) and each of the four categories of property interests identified in subsection (a)(2) or did Congress merely intend to require such a nexus for the last category of property interest (a property or contractual right of any kind)?

An analysis of the categories of property interests themselves is of little help. Three of the four categories (interest, claims against, property or contractual rights) are equally broad. Further, even a narrow definition of the individual categories is likely to lead to significant overlap (should not a debt owed by an enterprise provide the basis for a "claim against" as well as a "contractual right of any kind"? When is a share of stock in the enterprise not an "interest in" the enterprise as opposed to a "property right of any kind" or a "claim against" the enterprise?). Thus, it makes little sense for Congress to place the limitation of a nexus *only* on the fourth category of property identified in subsection (a)(2).

On the other hand, there is a logical appeal to the notion that because all four categories identified in subsection (a)(2) are very broad and tend to overlap, the requirement of a nexus should apply to each of the four categories. That approach finds support in Judge Murphy's observations in *Thevis* regarding the apparent purpose of the *two* subsections: Judge Murphy found subsection (a)(1) directed at the "forfeiture of a minority interest in an enterprise controlled by another,"[3] while subsection (a)(2)

---

**2.** The government directs the Court's attention to a passage contained in *Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 301, 78 L.Ed.2d 17 (1983). That passage does no more than recognize what appears obvious from the text of the statute itself: although subsection

(a)(2) forfeitures are limited to interests in an enterprise, there is no requirement that such an interest must be legally acquired.

**3.** As did many Courts (*see United States v. McManigal,* 708 F.2d 276, 283–87 (CA7 1983) *Thevis* limited the reach of subsection (a)(1) to

is directed at an interest in the enterprise where the defendant is in control, either alone or in conjunction with other defendants." *Thevis*, 474 F.Supp. at 143 & n. 14. Judge Murphy went on to require the government to prove assets were contributed or used to forward the goals of the enterprise before an (a)(2) forfeiture could be supported. *Id.* at 145.

▮ It is clear that Congress intended RICO forfeiture provisions to attack the economic lifeblood of large-scale economic criminals and organized crime. *See State-ment of Findings and Purpose*, Act of Oct. 15, 1970, Pub.L. No. 91–452, tit. IV § 901(a), 84 Stat. 941. *See also Weiner, supra* at 234–36. It is also clear that § 1963(a) accomplishes that goal when the "ill-gotten gains" from racketeering activity are forfeited under subsection (a)(1) and the controlling interest in an enterprise is forfeited under subsection (a)(2). However, it is not clear (perhaps even doubtful) that such a goal is accomplished when assets in a legitimate enterprise are subject to forfeiture for no other reason than the fortuity of a RICO Defendant's unfortunate investment in the very enterprise which is the subject of a RICO indictment. Such happenstance has little to do with RICO's "two-pronged attack on the sources of economic power which feed the coffers and activities of organized crime [by demanding] both divestiture of *power over* the enterprise itself and seizure of the *income derived* from racketeering activities." (emphasis added) (footnote omitted) *United States v. Martino*, 681 F.2d 952, 957 (CA5 1982).

Further, there is some doubt whether Congress could require the forfeiture of assets which have no connection to the underlying racketeering activity. For example, a forfeiture may conflict with the eighth amendment when the amount forfeited bears no relationship to the magni-

tude of a Defendant's racketeering activity. *See United States v. Lizza*, 775 F.2d 492, 498 (CA2 1985); *United States v. Kravitz*, 738 F.2d 102, 106 (CA3 1984); *United States v. Walsh*, 700 F.2d 846, 1348 (CA2 1983); *United States v. Tunnell*, 667 F.2d 1182, 1188 (CA5 1982); *United States v. Huber*, 603 F.2d 387, 397 (CA2 1979). *See generally Proposal to Reform Forfeiture, supra*, at 1935–36; *RICO Forfeitures, supra*, at 32–54. If such a situation arises, it is most likely to arise where the asset subject to forfeiture bears no relation to the racketeering activity which serves as the basis for a RICO conviction. Indeed, the Attorney General appeared to recognize such a constitutional dilemma in a letter to the Senate Judiciary Committee holding hearings on RICO. The Attorney General expressed no constitutional reservations when forfeiture was

> limited as it is in § 1963(a) to one's interest in the enterprise which is the subject of the specific offense involved here, and not extending to any other property of the convicted offender.

S.Rep. No. 612, 91st Cong. 1st Sess. 80 (1969). *See also United States v. Martino*, 681 F.2d 952, 959 (CA5 1982).

▮ The government does very little to convince the Court of a contrary congressional intent. For example, the government's position throughout this case has been that subsection (a)(2) is clear on its face and requires forfeiture of assets which have no connection with the underlying racketeering activity which supports a conviction. That position, however, ignores the various district courts which have required a jury instruction to the contrary and the circuit courts which have implicitly affirmed them. *See supra*, cases cited at 197–198. Therefore, the Court holds that, in order for the government to prevail on an (a)(2) forfeiture, it must show each of

---

interests in an enterprise and not the profits or proceeds derived from the enterprise. The Supreme Court overruled that view in *Russello v. United States*, 464 U.S. 16, 104 St.Ct. 296, 304, 78 L.Ed.2d 17 (1983) by concluding that subsection (a)(1) reaches interests in an enterprise as well

as profits derived from the enterprise. Congress came to a similar conclusion regarding RICO forfeitures generally. *See also* 18 U.S.C. § 1963(a)(3) (as amended by Pub.L. 98–473, 1984).

the four categories of assets have some connection (a nexus) with the underlying racketeering activity of which a Defendant is convicted. That nexus is shown when the government proves beyond a reasonable doubt that the relevant category of property provided the Defendant with a source of influence over an enterprise and Defendant has a property interest in that same enterprise.

## II Forfeiture of Particular Assets

### A. Horak's Stock.

 Horak owns approximately 150,000 shares of stock in Waste Management, Inc. That stock has an approximate market value of $8.5m. Because the shares were obtained prior to the dates charged in the indictment, the government concedes Horak did not obtain them in violation of § 1962(c). Thus, according to the Court's holding in part I, the shares of stock are subject to forfeiture only if the stock afforded Horak with a source of influence over the enterprise—Waste Incorporated and its various subsidiaries and divisions. The government has failed to meet its burden of proof. There is no evidence that Horak's shares of stock, amounting to less than 1% of outstanding shares, afforded him any influence over the operation of Waste Management, Inc. or its subsidiaries and divisions. Accordingly, Horak's stock in Waste Management, Inc. is not subject to forfeiture under § 1963(a)(2).

### B. Horak's job, salary, bonus, pension and profit sharing.

 The government contends that Horak's interest in his job, salaries, bonuses, pension and profit sharing plans were maintained in violation of § 1962(c) and are subject to forfeiture under § 1963(a)(1). The Court agrees. Horak's criminal activity (bribing public officials) enhanced his position as manager of HOD disposal. The award of a garbage contract by the Village to HOD unquestionably increased HOD's revenue. All of the interests identified by the government depended (in part or whole) upon Horak's performance as manager of HOD. Thus, Horak "maintained" his job, salaries, bonuses, and pension and profit sharing plans through his position as manager of HOD and his racketeering activity in violation of § 1962(c). The Court finds the following interests held by Horak are subject to forfeiture under § 1963(a)(1): (1) Horak's positions with HOD disposal, 2) bonuses and salaries paid to Horak from 1981 through 1985, and 3) Horak's interest in any pension and profit sharing plans connected with his position with HOD disposal.

IT IS SO ORDERED.

## APPENDIX

### STIPULATION

IT IS HEREBY STIPULATED to by and between the United States of America through its attorney, Anton R. Valukas, United States Attorney for the Northern District of Illinois, and the defendant, John Horak and his attorney, Peter F. Vaira, as follows:

1. John Horak's salary from Waste Management of Illinois, Inc. for the period July 5, 1981 through June 29, 1985 was as follows:

| Period | Salary |
| --- | --- |
| 7/5/81–12/31/81 | $27,923.04 |
| 1/1/82–12/31/82 | 68,826.86 |
| 1/1/83–12/31/83 | 66,499.94 |
| 1/1/84–12/31/84 | 69,800.12 |
| 1/1/85–6/29/85 | 38,865.50 |

2. John Horak's bonuses from Waste Management of Illinois, Inc. for the years 1981 through 1984 are as follows:

| Year | Bonus | |
| --- | --- | --- |
| 1981 | $ 7,300 | (Fox Lake Contract effective 7/5/81) |
| 1982 | 10,600 | |
| 1983 | 8,000 | |
| 1984 | 10,400 | |

The bonus is based upon budget achievement, i.e., the percentage of pre-tax income actually earned in relation to the budgeted pre-tax income. There are three levels of budget achievement, each with a corresponding dollar amount of bonus. Copies of Horak's bonus letters are attached hereto as Group Exhibit "1."

3. John Horak owns 158,778 shares of the common stock of Waste Management, Inc.

4. As of December 31, 1985, the total number of outstanding shares of common stock of Waste Management, Inc. was 102,082,034.

5. John Horak's profit sharing and savings benefits constitute voluntary employee contributions and company contributions. Employees are not required to make any contribution to the profit sharing and savings plan in order to qualify for the company contribution. Horak has always been 100% vested in his employee account balances and his company contributions.

6. As of June 30, 1985, John Horak's interest in the profit sharing and savings plan was $43,527.19. As of June 30, 1985, Horak's personal voluntary contribution to the plan totaled $36,555.04. The Company's contribution totaled $6,972.15.

7. John Horak's pension benefits vested in 1977. Each year of employment automatically increases Mr. Horak's vested percentage in his pension benefits. As of December 31, 1980, Horak's vested percentage was 40%. Horak's vested percentage for the years 1981 through 1985 was as follows:

| Year Ending | Vested Percentage |
| --- | --- |
| 12/31/81 | 45% |
| 12/31/82 | 50% |
| 12/31/83 | 60% |
| 12/31/84 | 70% |
| 12/31/85 | 80% |

8. The revenues of HOD Disposal for the years 1981–1983 were:

| Year | Revenue |
| --- | --- |
| 1981 | 3,613,028 |
| 1982 | 4,121,272 |
| 1983 | 4,433,801 |

9. The revenues received by HOD Disposal from the Fox Lake contract for the years 1981–1983 were:

| Year | Revenue |
| --- | --- |
| 1981 | 154,866 |
| 1982 | 162,240 |
| 1983 | 165,924 |

10. The revenues received by Waste Management of Illinois, Inc. for the years 1981–1983 were: ·

| Year | Revenue |
| --- | --- |
| 1981 | 86,936,757 |
| 1982 | 86,616,248 |
| 1983 | 86,194,890 |

11. The revenues received by Waste Management Inc. for the years 1981–1983 were:

| Year | Revenue |
| --- | --- |
| 1981 | 772,690,000 |
| 1982 | 966,548,000 |
| 1983 | 1,039,989,000 |