UNITED STATES of America

v.

Leonard A. PELULLO, Appellant.

Nos. 93–1261, 93–1284.

United States Court of Appeals, Third Circuit.

Argued Oct. 8, 1993.

Decided Jan. 24, 1994.

Sur Petition for Rehearing March 22, 1994.

John Nields (argued), W. Neil Eggleston, Richard A. Ripley, Diane B. Heller, Dianne S. Pickersgill, Howrey & Simon, Washington, DC, William J. Winning, Curran, Winning & Fioravanti, Media, PA, for appellant.

Michael J. Rotko, U.S. Atty., Ronald G. Cole (argued), Joel M. Friedman, Walter S. Batty, Jr., Frank A. Labor III, Asst. U.S. Attys., Philadelphia, PA, for appellee.

Before: HUTCHINSON, COWEN and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge:

This is the second time that Leonard A. Pelullo appeals to this court from the final judgment of conviction entered in the United States District Court for the Eastern District of Pennsylvania as well as the sentences imposed on him. We conclude that his appeal is meritorious and will reverse the conviction and the sentence imposed for the conviction resulting from the retrial. We will also vacate the resentencing on Count 54, which resulted from the first trial.

### I.

On July 3, 1991, a jury convicted Pelullo of 49 counts of wire fraud (18 U.S.C. § 1343), and one count of racketeering (Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1962), for engineering several schemes whereby Pelullo utilized the Royale Group, Ltd., a publicly held corporation, and its affiliates (Royale) which he controlled, to defraud the American Savings & Loan and the shareholders of Royale. On May 12, 1992, this court affirmed the conviction of wire fraud on Count 54, but reversed the conviction on all other counts and remanded the case for retrial. *United States v. Pelullo,* 964 F.2d 193 (3d Cir.1992) (*Pelullo I*). We also held that the district court could resentence Pelullo on Count 54. *Id.* at 222. The reversal was largely based on the erroneous admission by the district court of certain bank records and summaries thereof, which had not been qualified as business records under Fed.R.Evid. 803(6), or any other exception to the hearsay rules. *Id.*

On remand, Pelullo was retried on 48 counts of wire fraud and one count of RICO, and was convicted on all counts. The jury also returned a verdict of forfeiture pursuant to 18 U.S.C. § 1963(a) in the amount of

$1.854 million, together with Pelullo's interest in a ranch in Montana. On March 12, 1993, Pelullo was sentenced on all counts, including Count 54.

The facts that gave rise to the indictment against Pelullo are set forth at length in *Pelullo I,* 964 F.2d at 197–99. We will not repeat them here except as it is necessary to spell out that the indictment arose from several schemes that Pelullo allegedly designed to defraud American Savings and Loan (American) and to divert corporate funds for personal use.

The first scheme was the subject of Counts 1–53. These counts alleged that through Royale, the corporation which he controlled, Pelullo defrauded the American and Royale shareholders by diverting loan proceeds from American earmarked for hotel renovations for his own benefit. The *modus operandi* allegedly utilized by Pelullo was to submit false documents to American to secure disbursements which were supposed to be released only upon proof that funds had been expended for renovation. These counts independently constituted fraud violations of which Pelullo was convicted. They also constituted predicate acts, Racketeering Acts 1–59, for his alleged RICO violations.

The second scheme consisted of the facts giving rise to Count 54. Through this scheme, Pelullo allegedly defrauded Royale and its shareholders of $114,000 by diverting cash from a bank account of Palm Beach Heights Development & Sale Corporation (PBH), a wholly-owned subsidiary of Royale, and using the money to repay a debt Pelullo owed to a loanshark connected with the Philadelphia Mafia. This was alleged to constitute a separate wire fraud count as well as a predicate act, Racketeering Act 60, for the RICO count.

In the third scheme, Pelullo allegedly defrauded Royale and its shareholders by diverting to his personal use money which American had loaned Royale to pay administrative costs. The government did not allege these facts constituted independent wire fraud violations, but maintained that they constituted predicate acts, Racketeering Acts 61–72, for the RICO count.

Pelullo presents several issues in this appeal with each issue relating to a different set of facts. We will discuss the issues separately and summarize the facts necessary to decide that question where appropriate. The district court had jurisdiction under 18 U.S.C. § 3231, and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Pelullo contends that during the first trial, the government withheld *Brady* material from the defense despite a request for production. He therefore argues that he is entitled to a new trial on Count 54. We disagree.

In *Pelullo I* we affirmed the district court's judgment convicting Pelullo of Count 54. 964 F.2d at 222. That count charged Pelullo with diversion of corporate funds to pay a personal loan. The jury heard evidence during the first trial that Pelullo obtained a personal loan from a Mr. DiSalvo, who was said to be an associate of the Philadelphia Mafia. Pelullo failed to repay the loan. DiSalvo sought the assistance of the Philadelphia Mafia to effect collection. Philip Leonetti, who was described as the underboss of the Philadelphia Mafia, testified that the Mafia agreed to assist DiSalvo in collecting the debt from Pelullo in exchange for fifty percent of any amount collected. Leonetti, together with his uncle who was described as the boss of the Philadelphia Mafia, met with Pelullo and advised Pelullo that he had to repay DiSalvo. As a result of that meeting, Pelullo was alleged to have diverted $114,000 from a PBH bank account and wired the money to a family corporation in Philadelphia. Those corporate funds were later converted to cash for delivery to DiSalvo.

Following the first trial and the first appeal, but prior to retrial, the defense discovered that the government had withheld *Brady* material, despite Pelullo's request for production. The evidence was an IRS memorandum detailing an interview with Leonetti which set forth facts inconsistent with the testimony of Leonetti, particularly with respect to when and where he first met DiSalvo and Pelullo.

The government contends that it is "questionable whether this issue can be raised in this [second] appeal." Brief for Appellee at 24 n. 19. Pelullo's motion for a new trial on Count 54 was made under Rule 33 of the Federal Rules of Criminal Procedure. This rule provides that such a motion can be made before or within two years after final judgment. Pelullo made a timely motion and is entitled to appeal the ruling of the district court on his motion. He presents this issue in this appeal. Although it may have been preferable for Pelullo to separately appeal the district court's denial of his Rule 33 motion, we conclude that this appeal encompasses that purpose since he was resentenced on Count 54 on which he was convicted in the first trial, together with other counts on which he was convicted in the second trial. The issue has also been briefed thoroughly by the parties.

■ Ordinarily, we review the denial of a motion for new trial on the basis of newly discovered evidence for abuse of discretion. *See United States v. Perdomo*, 929 F.2d 967, 969 (3d Cir.1991). A *Brady* claim, however, presents questions of law and fact. Accordingly, we conduct a *de novo* review of the district court's conclusions of law and a review based on the "clearly erroneous" standard of its findings of fact. *Id.*

■ We conclude that the IRS memorandum qualifies as *Brady* evidence. Pelullo unquestionably could have used the memorandum to impeach Leonetti. Such impeachment evidence falls within the confines of the *Brady* rule. *Giglio v. United States*, 405 U.S. 150, 153–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Bagley*, 473 U.S. 667, 676–77, 105 S.Ct. 3375, 3380–81, 87 L.Ed.2d 481 (1985).

■ As much as we abhor a *Brady* violation, it does not mandate "automatic reversal." *Bagley*, 473 U.S. at 677, 105 S.Ct. at 3381. A reversal is warranted only when the suppression of the *Brady* evidence "undermines confidence in the outcome of the trial." *Id.* at 678, 105 S.Ct. at 3381. Put another way, we will reverse the district court judgment only when the *Brady* evidence would produce a "reasonable probability that the

result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. at 3383. We do not believe that the IRS memorandum would have such an effect.

Leonetti's testimony established that Pelullo diverted corporate funds for personal use. In addition to the testimony of Leonetti, two other witnesses testified to Pelullo's admission that he used the money to repay DiSalvo. Pelullo does not contend that the IRS memorandum contradicts this crucial fact. Rather, Pelullo focuses on the different versions of the dates when Leonetti met with him and DiSalvo, and argues that "these inconsistencies on the facts material to Mr. Pelullo's guilt on Count 54 would have devastated Leonetti's testimony about the timing of the payment in the eyes of the jury." Brief for Appellant at 30–31.

We do not believe that some inconsistencies in the dates would devastate the thrust of Leonetti's testimony on Pelullo's diversion of funds and, thus, would have changed the outcome of the proceeding. The evidence is merely cumulative or impeaching, *United States v. Adams,* 759 F.2d 1099, 1108 (3d Cir.), *cert. denied,* 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985), and thus, not sufficient to warrant a new trial.

Testifying in 1991 about events alleged to have taken place in 1985 and 1986, Leonetti could not be expected to remember the dates as if the events occurred yesterday. More important, Leonetti was subject to extensive cross-examination and impeachment. The defense attacked Leonetti's credibility by bringing to light the accounts of his murders and his desperate deals with the government in order to get out of prison sooner. If the cross-examination and impeachment evidence did not cause the jury to doubt Leonetti's credibility, additional evidence of inconsistencies merely with respect to the dates of meetings would do little to discredit his word. This is akin to the situation in *Adams,* 759 F.2d 1099. The defendant in *Adams* moved for a new trial after he discovered he was not informed that the government's witness had committed a crime before the trial. We discounted the value of that evidence:

> [The government witness] admitted to a minimum of twenty instances of unsavory conduct, ranging from infidelity to his wife to a conviction of misconduct in office while a public official.... If this evidence did not convince the jury to doubt [his] credibility, evidence of another relatively mundane crime would not be the "straw that broke the camel's back."

*Id.* at 1108.

The problem surrounding the dates of the meetings that took place among Leonetti, DiSalvo and Pelullo was made known to the jury. During the first trial, Pelullo cross-examined Agent Leyden, who interviewed Leonetti, about the absence of any mention as to the dates Leonetti allegedly met with DiSalvo and later with Pelullo. Any impeachment value of the inconsistencies showed in the IRS memorandum would have been dubious at best.

Finally, it appears that Pelullo himself did not accord much value to the IRS memorandum. Given Pelullo's cross-examination of Leyden, Pelullo was likely aware of the problem with respect to the dates, but did not cross-examine Leonetti on this point. Nor did Pelullo use the IRS memorandum to cross-examine Leonetti about the IRS interview during the retrial.

We are satisfied that the *Brady* evidence in this case does not lead to a "reasonable probability" that the result of the proceeding would have been different. We conclude that the district court did not err in denying Pelullo's motion for new trial on Count 54.

### III.

In *Pelullo I,* we affirmed Pelullo's conviction on Count 54 for wire fraud. Count 54 was also alleged to constitute one of the RICO predicate acts, namely Racketeering Act 60 in Count 55. During the second trial, the district court admitted the judgment of conviction on Count 54 into evidence for the purpose of proving the RICO count. The court then instructed the jury that "as a matter of law, the defendant has committed the wire fraud offense described in Racketeering Act 60. That means you don't have to consider whether the government has proved this offense." Joint App. at 405–406. Pelullo contends first, the district court erred

in admitting into evidence the judgment of conviction on Count 54 and, second, even if the judgment was properly admitted into evidence, the district court erred in applying the judgment against him as res judicata or collateral estoppel[1] to establish as a matter of law an element of the RICO offense.

### A.

Admitting a judgment of conviction into evidence as one of the many pieces of evidence to prove a case is very different from according a judgment collateral estoppel effect. As an ordinary piece of evidence, a judgment is subject to evaluation by the fact finder, who can accept or reject such evidence as it deems appropriate. On the other hand, as collateral estoppel a judgment will have the effect of establishing as a matter of law facts determined in the prior proceeding and necessary to the judgment. The fact finder in the second proceeding must take the judgment at its face value. We first address whether the district court erred in admitting the judgment of conviction on Count 54 into evidence as a proper piece of ordinary evidence.

Pelullo does not argue that the judgment of conviction on Count 54 is irrelevant to the RICO count. He recognizes that courts have accepted the position that prior convictions are admissible to show predicate acts in a RICO prosecution. *E.g., United States v. Grayson,* 795 F.2d 278, 283 (3d Cir.1986), *cert. denied,* 481 U.S. 1018, 107 S.Ct. 1899, 95 L.Ed.2d 505 (1987); *United States v. Pryba,* 680 F.Supp. 790, 792 (E.D.Va.1988), *aff'd,* 900 F.2d 748, 758 (4th Cir.), *cert. denied,* 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990); *United States v. Erwin,* 793 F.2d 656, 670 (5th Cir.), *cert. denied,* 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986).

■ Rather, Pelullo argues that "[a]lthough the conduct underlying a prior conviction may serve as a predicate act in a subsequent RICO prosecution, there is no legal authority that the government may present evidence of the actual judgment of conviction from a previous jury trial on the same indict-

ment." Brief for Appellant at 25. The essence of his position is that it is too prejudicial to a defendant to admit this evidence because the judgment of conviction comes from the same indictment as the jury presently has before it for resolution. In effect, this is an argument under Rule 403 of the Federal Rules of Evidence, that the defendant is being unfairly prejudiced by evidence which admittedly is relevant.

■ Rule 403 states that "[relevant] evidence *may* be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403 (emphasis added). This language places the decision to exclude such evidence within the sound discretion of the district court. We review the decision of the district court only for abuse of discretion. *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1237 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993).

■ In making a Rule 403 determination, the district court is required to balance the probative value against the prejudicial effect. The district court "must appraise the genuine need for the challenged evidence and balance that necessity against the risk of prejudice to the defendant." *Government of the Virgin Islands v. Archibald,* 987 F.2d 180, 186 (3d Cir.1993) (internal quotation marks and citations omitted).

The district court did acknowledge the potential prejudicial effect of admitting the judgment of conviction on Count 54, and undertook some precautionary steps to reduce that effect. *See United States v. Pelullo,* D.C.Crim. No. 91–00060, 1993 WL 216127 at *1–2 (E.D.Pa. June 18, 1993). However, the district court did not consider the value of the conviction for the government and the relatively slight burden for the government to reprove the facts upon which the judgment of conviction was based. We observe that even though the judgment of conviction on Count 54 was admitted into evidence and given preclusive effect by the ruling of the district court, the government was neverthe-

---

**1.** Properly denominated, we are dealing with collateral estoppel. However, the district court and the parties have used both terms interchangeably.

less allowed at the retrial to prove once again the facts underlying Count 54. Moreover, when the government introduced the evidence relating to Count 54, thus unilaterally nullifying agreed upon precautionary measures, the district court accepted the evidence without conducting any further balancing analysis.[2] It is thus unclear whether the district court gave adequate consideration to the defendant's claim of prejudice.

It is clear that the district court had before it a question of admissibility pursuant to Fed.R.Evid. 403. The district court did not engage in the balancing of appropriate factors which is a prerequisite to the admission of evidence under the rule. On remand the district court should conduct a balancing analysis, and state its reasons on the record for admitting or excluding the judgment of conviction. Such a procedure will facilitate any future appeals. See Archibald, 987 F.2d at 186 ("the trial judge should record his balancing analysis to the extent that his exercise of discretion may be fairly reviewed on appeal" (internal quotation marks and citations omitted)).

### B.

We now turn to Pelullo's contention that the district court erred in applying the judgment of conviction on Count 54 as collateral estoppel against him to establish as a matter of law an element of the RICO offense. The essence of the argument is that application of the doctrine of collateral estoppel deprived him of his right to a jury trial. We agree.

(a)

■ The government claims that in opposing admission into evidence the judgment of conviction on Count 54 and to the jury charge regarding this issue, Pelullo failed to specifically state collateral estoppel as the ground for his objections. The government argues that this point is reviewed only for plain error under Fed.R.Crim.P. 52(b). We have reviewed the record and find that the issue was properly preserved for appeal.

It is true that during hearings before the district court, defense counsel stressed the prejudicial effect of introducing Count 54 because it was from the same indictment. Joint App. at 114 (remarks of counsel for the defendant). It is equally clear, however, the defense counsel did specifically question and object to the "res judicata" effect on several occasions. For example, counsel for the defense considered that the court was "predisposed" to allow the res judicata effect, but made clear that he "doubt[ed]" such a ruling. Id. at 117.

Subsequently, Pelullo asked for a clarification of the "three-fold" ruling of the court on this issue. With the acquiescence of the district court, the prosecutor clarified that the underlying facts "necessary to establish Racketeering Act 60" were established as a matter of law, id. at 147, and that the defendant did not "have denyability as to those facts necessarily found by the jury in order to convict on Count 54," id. at 148. After that, Pelullo made specific objection to these res judicata effects and asked the court to deem his objections preserved.[3]

---

**2.** For example, even though the parties agreed not to let the jury know that there was a conviction on Count 54, Mr. Cole for the government stated in front of the jury at the very beginning of the trial:

> Your Honor, before I call my first witness, I want to move into evidence Government Exhibit 193. [A]s your Honor knows, Racketeering Act 60 alleges the violation of the wire fraud statute and I move the admission of Government Exhibit 193, which is the judgment which the defendant was previously convicted of that offense.

Supp.App. at 387. Upon objection by the defense, the district court at sidebar did not inquire into why the agreement was breached or conduct any balancing analysis on what value such a manner of starting a trial had for the govern-

ment, and what prejudice to the defendant might result. Id. at 387–88. The district court only responded: "But it's done and sooner or later you're going to hear about it." Id. at 388.

**3.** The following colloquy took place:

> MR. WINNING: ... I want the Court to understand that we object to any references to Count 54, or the res judicata effect, or a conviction, the whole subject matter we discussed. And I would like our position preserved, your Honor, on that part without objecting, standing up objecting repeatedly to any comment that [the government] would make.
>
> THE COURT: Any of those things that you have raised in your pretrial motions and I have denied I deem preserved for the purpose of this trial.

Joint App. at 148.

The repeated references to "res judicata" in that context clearly demonstrate that Pelullo did state res judicata (or collateral estoppel) as a ground for his objection, and the district court fully understood the nature of the objection. This issue has been properly preserved for appeal.

### (b)

We must decide whether the district court erred as a matter of law when charging the jury that the prior conviction on Count 54 operated as collateral estoppel, necessarily establishing Racketeering Act 60 (which constituted one of the predicate acts for the RICO count). Pelullo maintains this application of the collateral estoppel doctrine precluded the jury from considering every fact that underlies Racketeering Act 60 (Count 54), thus impinging upon his right to a jury trial. This is a question of constitutional interpretation for which we exercise plenary review. *United States v. Ciancaglini*, 858 F.2d 923, 926 (3d Cir.1988).

■ Collateral estoppel is part of the broader principle of res judicata, and generally bars relitigation of any issue which was actually determined in a prior action between the same parties. *See, e.g., Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). Originally developed in civil cases, collateral estoppel has been applied by the Supreme Court in criminal cases for the benefit of the defendant. *Id.* at 443–47, 90 S.Ct. at 1194–96. The Supreme Court rests such an application on the constitutional command in the Fifth Amendment guarantee against double jeopardy for the same offense. *Id.*

Neither the Supreme Court nor this court has addressed directly the issue of whether collateral estoppel can be applied against the

defendant in a criminal case. Instances of invoking collateral estoppel against the defendant have been rare, though not unheard of. *See Commonwealth v. Feldman*, 131 Mass. 588 (1881); *Commonwealth v. Evans*, 101 Mass. 25, 27 (1869). The increase in statutory crimes often makes it possible that a single transaction gives rise to criminal liability for multiple offenses. *See Comment, The Use of Collateral Estoppel against the Accused*, 69 Colum.L.Rev. 515, 516 (1969) (hereinafter *Columbia Comment*). This has resulted in the invocation of collateral estoppel against criminal defendants in the Ninth Circuit. *United States v. Colacurcio*, 514 F.2d 1, 6–7 (9th Cir.1975); *Pena–Cabanillas v. United States*, 394 F.2d 785, 786–88 (9th Cir.1968); *United States v. Rangel–Perez*, 179 F.Supp. 619, 626 (S.D.Cal.1959). *See also United States v. Bejar–Matrecios*, 618 F.2d 81, 83–84 (9th Cir.1980) (guilty plea applied as collateral estoppel). The U.S. Court of Appeals for the Eighth Circuit likewise adopted this rule. *See Hernandez–Uribe v. United States*, 515 F.2d 20, 21–22 (8th Cir.1975), *cert. denied*, 423 U.S. 1057, 96 S.Ct. 791, 46 L.Ed.2d 647 (1976).[4]

The Massachusetts cases provided no analysis for their holding. In *Feldman*, the defendant was first charged with drunkenness to which he pleaded guilty. 131 Mass. 588. Subsequently, he was charged with assaulting a police officer with a dangerous weapon. Feldman attempted to introduce evidence to show that he was not drunk at the time of the alleged assault. *Id.* The court without analysis stated:

> The conviction and sentence of the defendant for drunkenness was a conclusive adjudication, as between him and the Commonwealth, that he was drunk at the time of his arrest.

---

4. The government contends that *United States v. Pryba*, 680 F.Supp. 790 (E.D.Va.1988), *aff'd*, 900 F.2d 748 (4th Cir.), *cert. denied*, 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990), supports applying collateral estoppel against the accused in a RICO case to establish predicate acts. *Pryba* is ambiguous. The case does not use the term collateral estoppel or res judicata. The court stated that "a prior state court conviction is admissible to prove a predicate act of racketeer-

ing activity necessary to establish a RICO violation." *Id.* at 792. We do not read "admissible" as "admissible as collateral estoppel." We have explained above the difference between being admissible as an ordinary piece of evidence and being admissible as collateral estoppel. Nor does *United States v. Black*, 759 F.2d 71 (D.C.Cir. 1985) (per curiam), a case cited in *Pryba*, state anything other than prior convictions are admissible. *Id.* at 73.

*Id.* In another criminal case the same court justified its application of collateral estoppel against the defendant with only the following sentence: "Upon general principles, the parties being the same, the former judgment must be held to have established all facts which were involved in the issue then tried, and essential to the judgment rendered upon it." *Evans,* 101 Mass. at 27 (1869). These cases provide little or no legal analysis for their holding, and for that reason are not persuasive.

Nor do more recent federal cases provide adequate guidance. The Court of Appeals for the Ninth Circuit, after citing the cases where collateral estoppel has been applied *in favor of* criminal defendants, extended the application of that doctrine *against* the defendant. *See, e.g., Pena–Cabanillas,* 394 F.2d at 786–87; *Colacurcio,* 514 F.2d at 4–5. The court did so without explaining why these cases supported the jump from applying the doctrine *for* the defendant to *against* the defendant. *Id.*

Rather than resting on a constitutional mandate such as announced in *Ashe v. Swenson,* 397 U.S. at 443–47, 90 S.Ct. at 1194–96, those lower federal courts which have ventured to apply collateral estoppel against the accused have grounded their holding on a perception of "wise public policy and common sense judicial administration." *Pena–Cabanillas,* 394 F.2d at 787. *Accord Colacurcio,* 514 F.2d at 5. In *Pena–Cabanillas,* the defendant was convicted in 1964 of falsely representing himself as a United States citizen, and was subsequently indicted in connection with another event for willingly and knowingly entering the Untied States as an alien without the consent of the Attorney General. 394 F.2d at 786. The court held that the fact that the defendant was not a citizen was already proven once, and could be applied against him in the second trial through the doctrine of collateral estoppel. *Id.* at 786–88. The Court of Appeals for the Ninth Circuit endorsed the district court's position that "wise public policy and common sense judicial administration combine to advocate the application of the doctrine against a defendant in criminal cases." *Id.* at 787.

The "wise public policy and common sense judicial administration" relied upon by the court in *Pena–Cabanillas* was the need to stop illegal aliens from attempting to enter this country time after time. The court reasoned that illegal aliens would be encouraged to reenter the country if they knew they would receive a jury trial on their illegal status each time they were apprehended. *Id.* at 787–88 (quoting *United States v. Rangel–Perez,* 179 F.Supp. 619, 626). *Accord Hernandez–Uribe,* 515 F.2d at 21–22.

Such reasoning subordinates the defendant's constitutionally guaranteed right to a jury trial to concerns for efficient judicial administration and judicial perceptions of expeditious public policy. These cases have been severely criticized for not paying sufficient attention to the constitutional objections. *See Columbia Comment,* 69 Colum.L.Rev. at 516 ("[t]his practice [of applying collateral estoppel against a criminal defendant] raises serious policy and constitutional issues which have not been adequately dealt with by the courts").

(c)

Despite the above cases, there has been a strong, unelaborated assumption that the doctrine of collateral estoppel cannot be invoked in criminal cases against the defendant. Judges have stressed in dicta that unlike in civil cases, the collateral estoppel principle should not be applied to both parties in criminal cases.

In *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the Supreme Court held that because the jury at the first trial did not find the defendant to be one of the robbers, collateral estoppel barred the government from arguing at the second trial that he was one of the robbers. *Id.* at 445, 90 S.Ct. at 1195. Though disagreeing with the Court's holding, Chief Justice Burger stated that "[if the defendant] had been convicted at the first trial, presumably no court would then hold that he was thereby foreclosed from litigating the identification issue at the second trial." *Id.* at 465, 90 S.Ct. at 1205 (Burger, C.J., dissenting).

Before *Ashe v. Swenson* and in equally unequivocal terms, we stated in dicta that

"[a]n accused is constitutionally entitled to a trial de novo of the facts alleged and offered in support of each offense charged against him and to a jury's independent finding with respect thereto." *United States v. De Angelo*, 138 F.2d 466, 468 (3d Cir.1943), *cited in Sealfon v. United States*, 332 U.S. 575, 578, 68 S.Ct. 237, 239, 92 L.Ed. 180 (1948). More recently, a district court in this Circuit reiterated this theme: "An accused is always constitutionally entitled to a trial de novo of the facts alleged ... and collateral estoppel is available as a defense even though *it can never be raised offensively by the prosecution*." *United States v. Bruno*, 333 F.Supp. 570, 576 (E.D.Pa.1971) (emphasis added). *See also United States v. Carlisi*, 32 F.Supp. 479, 482 (E.D.N.Y.1940) ("A prior adjudication with respect to an element of a subsequently tried offense is not binding upon the accused. This is so because the defendant, charged with crime, always has the right to have the jury or the triers of the facts determine anew every element of guilt.").

These statements embody the proposition that the constitutional right to a jury trial bars application of collateral estoppel against a criminal defendant. This position has been embraced by the New Jersey Supreme Court in *State v. Ingenito*, 87 N.J. 204, 432 A.2d 912, 915–919 (1981).

In *Ingenito*, the New Jersey Supreme Court squarely held that collateral estoppel cannot be applied against a defendant in a criminal case. *Id.* The court first noted the time-honored proposition that the right to a jury trial in criminal cases is an enshrined right embedded in the long history of Anglo–American jurisprudence. *Id.* 432 A.2d at 915. It went on to observe that the jury has the nondelegable and nonremovable responsibility to decide the facts, *id.*, and to unearth the truth, *id.* 432 A.2d at 916. The court noted that under this principle, the "question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury." *Id.* (quoting *Bollenbach v. United States*, 326 U.S. 607, 614, 66 S.Ct. 402, 406, 90 L.Ed. 350 (1946)). The New Jersey Supreme Court concluded:

> The application of collateral estoppel against a defendant constitutes an invasion

of the fact finding and ultimate decisional functions of the jury. If an essential element of a case is presented as concluded or settled, effectively withholding from the jury crucial underlying facts, the jury's capacity to discharge fully its paramount deliberative and decisional responsibilities is irretrievably compromised. It follows in such circumstances that the defendant's jury right will have been, commensurately, abridged.

432 A.2d at 916.

Finally, the New Jersey Supreme Court found that such an application of collateral estoppel conflicts with the presumption of innocence as to every element of a crime and impermissibly shifts the burden of proof to the defendant. *Id.* 432 A.2d at 917. *Accord People v. Goss*, 200 Mich.App. 9, 503 N.W.2d 682, 686–88 (1993) (adopting both the holding and reasoning of the New Jersey Supreme Court), *appeal granted*, —— Mich. ——, 511 N.W.2d 675 (Mich.1993). We believe this is a powerful elaboration of the proposition that application of collateral estoppel against a defendant in criminal cases violates the defendant's constitutional right to a jury trial, if the defendant has a right to a jury trial in the second prosecution for a different crime with respect to the same issue that was determined in a conviction.

### (d)

Some discussion is appropriate concerning the position of the Court of Appeals for the Ninth Circuit in favor of applying the doctrine of collateral estoppel against the accused based on public policy and efficiency in judicial administration. In particular, we need to address the question why, after the defendant received a fair jury trial with respect to a fact question, he is entitled to a second jury trial on the same issue in a subsequent criminal case.

At the outset, we do not accept the position of the Court of Appeals for the Ninth Circuit that "wise public policy and common sense judicial administration," *Pena–Cabanillas v. United States*, 394 F.2d 785, 786 (9th Cir. 1968), are good and sufficient reasons to apply collateral estoppel against the defendant, thereby taking away a fact issue from

the jury in a subsequent criminal case. This "wise public policy and judicial efficiency" argument originates in civil cases in which prompt resolution of the claims and finality are desirable. The Court of Appeals for the Ninth Circuit's application of this civil case rationale in criminal cases presumably rests on the major premise that public policy and judicial efficiency have the same weight and value in criminal cases as in civil cases. Such an implicit premise does not hold.

It is widely recognized that "in criminal cases, finality and conservation of private, public, and judicial resources are lesser values than in civil litigation." *Ashe v. Swenson*, 397 U.S. at 465, 90 S.Ct. at 1205 (Burger, C.J., dissenting). When commenting on the effect of a judgment in a criminal case, the Reporter of the Restatement of Judgments stated that criminal cases involved "questions of policy quite different from those applicable to civil proceedings." Austin Scott, *Introduction to Res Judicata—a Symposium*, 39 Iowa L.Rev. 214, 216 (1954). In a civil case, only monetary damages are at stake. In a criminal case, however, "[the accused] has at stake interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction." *In re Winship*, 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970).

This "interest of transcending value," *id.*, of the accused to vindicate himself in a criminal case, has been held to be paramount in a variety of matters. It has been held to trump the President of the United States' general claim of absolute presidential privilege, *see United States v. Nixon*, 418 U.S. 683, 703–16, 94 S.Ct. 3090, 3105–11, 41 L.Ed.2d 1039 (1974); a state's important interest in preserving the anonymity of juvenile offenders, *see Davis v. Alaska*, 415 U.S. 308, 318–21, 94 S.Ct. 1105, 1111–12, 39 L.Ed.2d 347 (1974); and a patient's privacy interest in the confidentiality of medical records and the societal interest in encouraging the free flow of information between patient

and psychotherapist, *see United States v. Lindstrom*, 698 F.2d 1154, 1166–67 (11th Cir. 1983). While these public interest concerns are of the highest magnitude, they, nevertheless, give way to the need of a criminal defendant to defend himself effectively in criminal proceedings. We conclude that the liberty interest of a criminal defendant takes priority over the usual concerns for efficient judicial administration so often found in civil proceedings.[5]

Our system of criminal justice prides itself on the ability to assure that no innocent person is convicted wrongfully, rather than on swift and immediate action. We strive to achieve the aim that "guilt shall not escape or innocence suffer." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). On those rare occasions when we do require swift action, we demand it for the benefit of the defendant. *See, e.g.*, Speedy Trial Act, 18 U.S.C. §§ 3161–3174. When faced with a choice between the need to prevent the innocent from possible wrongful conviction and efficient judicial administration and finality, we have consistently favored the former.

■ In addition, one acceptable method of interpreting the Sixth Amendment right to a jury trial is to examine the historical practice of the United States and England at the time the Bill of Rights was ratified. *See Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *Columbia Comment*, 69 Colum.L.Rev. at 522. *See also* Henry P. Monaghan, *Our Perfect Constitution*, 56 N.Y.U.L.Rev. 353, 374–387 (1981) (espousing the search for original intent in constitutional adjudication). The government does not point to any case on or before 1791 in which collateral estoppel was applied against an accused in a criminal case. Nor did the Courts of Appeals for the Ninth Circuit or the Eighth Circuit. *See United States v. Colacurcio*, 514 F.2d 1, 6–7 (9th Cir.1975); *Pena–Cabanillas v. United States*, 394 F.2d 785, 786–88 (9th Cir.1968); *Hernandez–Uribe v. United States*, 515 F.2d 20, 21–22 (8th Cir.1975), *cert. denied*, 423 U.S. 1057,

---

5. We note that the provisions on collateral estoppel contained in Restatement of Judgments were restricted to civil proceedings, *see* Restatement of Judgments 2 (scope note). This position has not been modified, *see* Restatement (Second) of Judgments 1 (introduction).

96 S.Ct. 791, 46 L.Ed.2d 647 (1976). Indeed, these courts did not conduct a constitutional analysis. They merely relied upon their perception of "wise public policy and efficient judicial administration" for their holding. *See id.* Academic commentators have discovered little evidence that collateral estoppel was employed against the accused at the time when the Bill of Rights was debated and ratified.[6] *See, e.g., Columbia Comment, supra,* at 523 ("evidence of its use against the accused is ... ambiguous"); Marlyn E. Lugar, *Criminal Law, Double Jeopardy and Res Judicata,* 39 Iowa L.Rev. 317, 319 n. 9 (1954) ("At early common law there was no plea of res judicata in criminal cases.... There were only four pleas in bar: a former acquittal, former conviction, a former attainder, or a pardon.... 4 Bl[ackstone] Comm. *335."); Annotation, *Modern Status of Doctrine of Res Judicata in Criminal Cases* § 9, 9 A.L.R.3d 203, 241–244 (1966 & Supp.1993). In applying such a method of searching for historical practices, we are forced to conclude that the framers would not have meant to apply collateral estoppel against a criminal defendant.[7]

■ Finally, and of even greater importance, we believe the literal language of the Sixth and Seventh Amendments supports a reading that the right to a jury trial in every criminal prosecution is absolute, even without reference to the then existing common law. Even though the relevant language has not been analyzed by courts or commentators in the context of applying collateral estoppel against a defendant in a criminal case, the actual language provides a textual anchor for the position against applying collateral estoppel against an accused.

The right to a jury trial as a protector for the people to "prevent oppression by the Government," *see Duncan v. Louisiana,* 391 U.S. at 155, 88 S.Ct. at 1451, was first granted in Article III, § 2 of the Constitution, and then in the Sixth Amendment. Article III, § 2 states that "[t]he trial of all Crimes, except in Cases of Impeachment, shall be by Jury." The use of "all Crimes" necessarily means "every" crime, and rules out any ex-

---

**6.** After the Bill of Rights was ratified, two English trial courts gave preclusive effect to certain condemnation records in two unreported cases which were "informations" against the defendants. These cases were *The King v. Matthews* (Trinity Sittings, 1797) and *Attorney General v. Wakefield* (Sittings after Michaelmas, 1797), cited and summarized by the parties in *Attorney General v. King,* 5 Price 195, 202 n. 2, 146 Eng.Rep. 579, 582 n. 2 (Ex.Div.1817). In *King,* the prosecutor relied upon these two cases to argue for similar preclusive effect. Without addressing either *Matthews* or *Wakefield,* the court declined to give preclusive effect to the condemnation records, reasoning that the condemnation proceeding and the criminal case against King were based on different statutes. *Id.* at 214, 166 Eng. Rep. at 586. Both *Matthews* and *Wakefield* are questionable because of the different burden of proof in the condemnation proceeding and the information cases against the defendants, not to mention the problem relating to jury trial. Neither *Matthews* nor *Wakefield* appears to have been noticed by any other English court.

It is commonly recognized that until 1974, there was still no direct English authority regarding the question whether issue estoppel applies in criminal proceedings, *see D.P.P. v. Humphrys,* [1976] 2 All E.R. 497 (H.L.), 504–505 (Op. of Viscount Dilhorne), 516 (Op. of Lord Hailsham), 531 (Op. of Edmund–Davies); *R. v. Hogan,* [1974] 2 All E.R. 142, 145 (Crown Ct.). *Hogan* is the first reported case where the court held that issue estoppel is available to the Crown against

the defendant. [1974] 2 All E.R. at 155. The House of Lords overruled this case in *Humphrys, supra,* at 506 (Op. of Viscount Dilhorne), 516 (Op. of Lord Hailsham), 529 (Op. of Lord Salmon), 532 (Op. of Lord Edmund–Davies), 538 (Op. of Lord Fraser).

**7.** The Supreme Court has held that the Seventh Amendment was not meant to preserve the *procedural exactitudes* as they existed in 1791, and allowed non-mutual offensive use of collateral estoppel in civil cases. *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 333–38, 99 S.Ct. 645, 652–655, 58 L.Ed.2d 552 (1979). Civil cases are different from criminal cases. The Supreme Court itself has declined to extend *Parklane* to criminal cases. *Standefer v. United States,* 447 U.S. 10, 21–25, 100 S.Ct. 1999, 2006–09, 64 L.Ed.2d 689 (1980). As discussed below, there are significant differences between the Seventh Amendment and the Sixth Amendment. Dissenting in *Parklane,* then Justice Rehnquist maintained that the Court's holding would not pass scrutiny under the Sixth Amendment. *Parklane,* 439 U.S. at 348, 99 S.Ct. at 660 ("It can scarcely be doubted, though, that such 'procedural reforms' would not survive constitutional scrutiny under the jury trial guarantee of the Sixth Amendment."). Finally, we note that applying collateral estoppel against the defendant to establish an element of the criminal offense is not a procedural matter, but an interference with the essential function of the jury.

ceptions to the right. The Supreme Court has interpreted the term "crime" as not including petit offenses, *see Schick v. United States*, 195 U.S. 65, 24 S.Ct. 826, 49 L.Ed. 99 (1904), but once it is determined what a crime is, the right to a jury trial is absolute.

In a similar vein, the Sixth Amendment states:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI. The language of this amendment is significant for both its concrete detailing of the incidences of the right to a jury trial and its stressing "all criminal prosecutions." The absolute right to a jury trial in *all*, rather than in just one, criminal prosecution is obvious from the text. A fair reading of this language leads to the conclusion that the Amendment contemplates the defendant is entitled to a jury trial in every prosecution that is criminal. This language serves to guarantee a right that is absolute in the sense that it applies to all criminal prosecutions or, put differently, to the prosecution of every crime.

The language of the Sixth Amendment does not admit of any indication that the absolute right to a jury trial in criminal cases can be modified by reasons of efficiency or public policy arguments. This reading of the Sixth Amendment comports with and is supported by the uniformly accepted notion that in criminal cases there is no mechanism available to the government comparable to making a motion for directed verdict or summary judgment in civil cases. Indeed, no matter how strong and even overwhelming the evidence is, and although a judge can grant a judgment of acquittal in favor of the defendant before or even after the jury renders its verdict, *see* Fed.R.Crim.P. 29, a criminal defendant in federal courts can be convicted only by the verdict of a jury.

 The Seventh Amendment, in contrast to the Sixth Amendment, does not guarantee an absolute right to a jury trial in civil cases. Rather, this right in civil cases is explicitly referenced to the historical practice at the time the amendment was ratified. The Seventh Amendment states:

> In suits at common law, where the value in controversy shall exceed twenty dollars, the right to trial by jury shall be preserved, and no fact tried by jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII. As is clear from this language, the right to trial is only "preserved" to the extent it existed at common law when the Amendment was ratified in 1791. *See Curtis v. Loether*, 415 U.S. 189, 193, 94 S.Ct. 1005, 1007, 39 L.Ed.2d 260 (1974); *Galloway v. United States*, 319 U.S. 372, 392, 63 S.Ct. 1077, 1087, 87 L.Ed. 1458 (1943) ("the [Seventh] Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements"). Accordingly, because collateral estoppel could be applied against the defendant in civil cases at the time the Seventh Amendment was enacted, its application in subsequent cases would not be violative of the right to a jury trial in civil cases.

The differences in the language of the Sixth and Seventh Amendment are instructive. Because both amendments were debated and enacted at the same time, and thereafter ratified together in 1791, the framers intended them to have a different import by using dramatically different languages. The elaborate, commanding and absolute language of the Sixth Amendment serves to establish and solidify forever the right to a jury trial in every criminal prosecution. Had the Sixth Amendment been enacted *solely* to preserve the right to a jury trial in criminal cases only as it existed at the time of its enactment, language similar to that of the Seventh Amendment would have been sufficient, particularly where the right to a jury trial in criminal cases was secured in *all* twelve state constitutions written from 1776

to 1787. *See* Leonard W. Levy, *Emergence of a Free Press* 227 (1985). The language of the Sixth Amendment can be given its full meaning and effect only by strict application.

The language of the Seventh Amendment operates to freeze in a time frame the right to a jury trial in civil cases. The value of efficiency that motivates the application of collateral estoppel against the defendant in civil cases, which existed in 1791, receives the constitutional sanction of the Seventh Amendment. Such sanction is absent in the Sixth Amendment. However salutary public policy and efficiency values may be, they must yield to the constitutional mandate of the Sixth Amendment for a jury trial in every criminal prosecution.

■■ The right to a jury trial applies in every and all criminal prosecutions. We hold that such a right to a jury trial necessitates that every jury empaneled for a prosecution considers evidence of guilt afresh and without the judicial direction attending collateral estoppel. *Ingenito*, 432 A.2d at 915–19; *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) (due process requires proof "beyond a reasonable doubt of every fact necessary to constitute the crime"). As the New Jersey Supreme Court articulated, applying collateral estoppel against the defendant in a criminal case interferes with the power of the jury to determine every element of the crime, impinging upon the accused's right to a jury trial. *Ingenito*, 432 A.2d at 915–16. Such an application is constitutionally invalid.

(e)

■■ At oral argument, the government proposed for the first time that we need not adopt the district court's collateral estoppel theory in order to affirm the conviction. Rather, the government contends that in this particular case we can expand the "law of the case" doctrine to cover the district court's application of the collateral estoppel doctrine.

The government proposed no justification for this argument other than offering the analogy to the bifurcation of trial in certain other matters. One example the government points to is the bifurcation of trial in RICO cases in which the underlying RICO violation and the forfeiture claim are separately considered by the jury. We need not detain ourselves for long with this example. A forfeiture claim is not the same as a substantive criminal charge, *see United States v. Sandini*, 816 F.2d 869, 875 (3d Cir.1987), even though Congress has provided for a heightened burden of proof with respect to such a claim. *See* Part VI of this opinion. Moreover, although we may not see any problem with the same jury considering in a bifurcation scenario the underlying RICO violation as well as the relationship between the RICO violation and the property to be forfeited, it is not at all clear that if a second jury is empaneled to consider the relationship between the RICO violation and the property, it can be precluded from considering the facts underlying the RICO violation all over again to determine that relationship. Such a procedure may be necessary even though the second jury is instructed that a RICO violation has previously been found. We leave this question for another day.

A second example the government offers is the case where the defendant is indicted for possessing a firearm while a convicted felon. The trial procedure employed is to bifurcate so that the jury hears evidence on and decides the possession of firearm element before it hears evidence on whether the defendant is also a convicted felon. *See, e.g., United States v. Joshua*, 976 F.2d 844, 848 (3d Cir.1992). We note that such a practice has been developed solely for the benefit of the defendant, so that he will not be prejudiced by virtue of the jury knowing that he is a convicted felon before considering the element of possession. It has been used in favor of, not against, the defendant. In addition, in such circumstances the same jury considers both elements of the crime. The government points to not a single instance in which two different juries were empaneled to consider the elements separately.

In the case *sub judice*, we have two separate trials and two different juries empaneled to try two different crimes. This scenario is quite different from the examples offered by the government. Because of these fundamental differences, the analogies are not apt,

and do not lend any support for applying the law of the case doctrine to justify a denial of the right to trial by jury on an element of the RICO offense. We reject the government's proposal to expand the law of the case doctrine on the facts of this case.

#### (f)

██ By reason of our analysis, we conclude that the district court erred in applying the prior conviction on Count 54 as collateral estoppel against Pelullo. The record reflects that Racketeering Act 60 included only those facts underlying Count 54. The jury's finding on Racketeering Act 60 resulted from the erroneous instruction by the district court that Racketeering Act 60 was established as a matter of law. This finding must be set aside.

Normally, reversal of the finding of one racketeering act does not necessitate reversal of the conviction of the entire RICO count when there are additional predicate acts to sustain the verdict. In this case, however, there are no such additional predicate acts. During oral argument, the government represented that Racketeering Act 60 is the only predicate act within the statute of limitations for the RICO count. Transcript of Arg. 54–55. Count 55, the RICO count, cannot stand without Racketeering Act 60. Therefore, we must reverse the conviction on the RICO count.

#### IV.

We now address the question of taint in this case. During retrial the district court decided not only to apply the judgment on Count 54 as collateral estoppel against Pelullo but, in addition, permitted the government to prove once again the very facts underlying Count 54. The government justified the use of this evidence on the theory that it proved a pattern of racketeering conduct. The government called witnesses including Leonetti, underboss of the Mafia, to give basically the same testimony that was offered at the first trial. On the government's motion to apply the judgment on Count 54 as collateral estoppel, the defense was explicitly advised in a pretrial hearing that the defendant did not "have denyability as to those facts necessari-

ly found by the jury [in the first trial] in order to convict on Count 54." Joint App. at 148.

Pelullo argues that the district court's decision to apply collateral estoppel against him had the practical effect of precluding Pelullo from attempting to establish several essential facts by cross-examining and testifying himself contrary to the testimony of Leonetti and others (which he did at the first trial), even though he testified at the retrial as to other matters. However, the government contends that at the retrial there was no restriction on the ability of the defendant to cross-examine the witnesses concerning the facts to which the court had ordered collateral estoppel to apply. We agree with Pelullo because the district court was going to instruct the jury that the facts were, as a matter of law, just the opposite of what Pelullo was attempting to establish by cross-examination and with his own testimony. One example is that Pelullo did not provide any testimony that he never met Leonetti, which he did at the first trial. The effect of the ruling by the district court on collateral estoppel was to allow Leonetti's testimony to go uncontroverted.

██ Pelullo contends that the district court's ruling on the judgment on Count 54 tainted the trial not only with respect to the RICO count, but also as to all other counts. He asks us to reverse the conviction on the 48 counts of wire fraud violations in addition to the conviction on the RICO count. We are thus faced with a difficult question of ascertaining whether the prejudicial effect of the error in one count affected the jury's consideration of other counts. Difficult though the task is, we conclude that there is sufficient prejudicial effect to warrant reversal of the convictions on all 48 wire fraud counts.

██ Generally, invalidation of the convictions under one count does not lead to automatic reversal of the convictions on other counts. *United States v. Ivic,* 700 F.2d 51, 65 (2d Cir.1983). When confronted with a problem of taint, we must "consider whether the presence of the [invalidated] count had

any spillover effect sufficiently prejudicial to call for reversal." *Id.*

 In assessing the spillover effect of one count upon another, an important inquiry is whether the charges are intertwined with each other. *See United States v. Berkery,* 889 F.2d 1281, 1285 (3d Cir.1989). In *Berkery,* this court found that the conviction on Count 1, charging the defendant of engaging in a conspiracy to possess and distribute P2P, must be reversed because constitutionally invalid, coerced admissions were utilized. The question remaining was whether the invalidity of Count 1 called for reversal of Counts 2–14, charging the defendant with the substantive offenses of possessing and distributing P2P. *Id.* at 1282, 1285. We found that the substantive charges in Counts 2–14 were closely intertwined with those in Count 1, and reversed the convictions on Counts 2–14 because of the potential for confusion on the part of the jury. *Id.* at 1285.

Although the 48 wire fraud counts and Count 54 are not as intertwined with each other as the conspiracy and substantive counts were in *Berkery,* nevertheless, we believe the 48 wire fraud counts are sufficiently similar to Count 54 so as to create substantial confusion on the part of the jury. Just like the 48 wire fraud counts, Count 54 is a wire fraud count. A review of the indictment reveals that all these counts alleged similar fraud consisting of similar conduct, such as falsification of corporate documents and diversion of corporate funds for personal use. The charges also described similar, if not identical, methods used in the alleged frauds. The government used identical language in these counts. For example, in Counts 1–53, the government stated:

> The defendant, LEONARD A. PELULLO, in order to conceal the personal use of corporate funds, intentionally failed to maintain adequate business records that would contemporaneously record and document the disbursements for the defendant's personal benefit and the renovation costs of the art deco hotels, thus preventing an accurate accounting of the transactions.

Joint App. at 33. In Count 54, the government stated:

> The defendant, LEONARD A. PELULLO, in order to conceal the personal use of corporate funds, intentionally failed to maintain adequate business records that would contemporaneously record and document the disbursements for the defendant's personal benefit, thus preventing an accurate accounting of the transactions.

Joint App. at 36. Because of the similarities of the counts, we believe that the risk of jury confusion is significant.

 Another factor we consider is whether the evidence for the different counts was sufficiently distinct to support the verdict on other separate counts. *See United States v. Brown,* 583 F.2d 659, 669 (3d Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). If the evidence was distinct, it is likely that there was no prejudicial spillover effect and no need to reverse the verdict on all counts. *Id.* We have recognized that "evidence pertaining to each count was not, and probably could not have been, segregated at the trial and in the minds of the jurors." *United States v. De Cavalcante,* 440 F.2d 1264, 1276 (3d Cir. 1971). When we found that the jury was likely to be confused or relied upon improper evidence, we did not hesitate to reverse the conviction on the counts that were possibly tainted. *Id.*

The evidence for Count 54 and the other 48 wire fraud counts was technically distinct because different transactions were at issue. Yet, the jury may well have been confused because much of the evidence on all counts was similar, *e.g.,* wire transfer documents, bank records, and corporate documents. The problem became even more acute because the charges alleged similar schemes of diversion of corporate funds, and the government used almost identical language to frame the charges.

Courts also ask whether substantially all the evidence introduced to support the invalid conviction would have been admissible to prove other counts, and whether the elimination of the count on which the defendant was invalidly convicted would have significantly changed the strategy of the trial. *See, e.g., United States v. Ivic,* 700 F.2d 51, 65 (2d

Cir.1983). The *Ivic* court found that the evidence was admissible to prove all counts, and that eliminating the invalid count would not have changed trial strategy. Thus, no spillover effect resulted. *Id.* The instant case is quite the contrary. We find that the evidence the government introduced to reprove Count 54 in the second trial was not admissible to prove the other 48 wire fraud counts, and that elimination of the RICO count would have significantly changed trial strategy.

Finally, courts examine the charges, the language that the government used, and the evidence introduced during the trial to see whether they are "of the sort to arouse a jury." *Ivic, id.* at 65. Another concern is whether the defendant was branded with some terms with "decidedly pejorative connotation," *id.,* so that the prejudicial spillover effect is palpable. The *Ivic* court found that the evidence introduced to prove the invalid count was jury-arousing, and that the defendant was branded with pejorative terms, but saw no prejudice with respect to other counts because the evidence on the invalid count was also admissible to prove other counts and because the evidence on those other counts was overwhelming. *Id.* The court further found evidence that the jury was able to overcome any prejudice, since the jurors reached a discriminating acquittal on one of the counts. *Id. See also United States v. Friedman,* 854 F.2d 535, 581–82 (2d Cir. 1988) (finding no prejudicial spillover effect), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989).

The problem of jury-arousing evidence and pejorative branding is serious in this matter. Pelullo was not only branded as a convicted felon and a racketeer by the government, but also portrayed as a person associated with the Mafia, whose reputation, we have little doubt, influenced the jurors. In addition, because of the district court's decision to apply Count 54 as collateral estoppel, Pelul-

lo's ability to controvert the testimony used to reprove Count 54 was totally impaired.[8]

Specifically, the district court permitted Leonetti, the alleged underboss of the Mafia, to take the stand and relate how he conducted several meetings with Pelullo and his brother. Pelullo did not attempt to contradict Leonetti at the second trial (even though Pelullo testified during the first trial that he had no dealings with Leonetti and in fact never met Leonetti), since the jury would be charged that any testimony of Pelullo contradicting Leonetti was false as a matter of law by reason of collateral estoppel. Thus Leonetti testified at retrial without risk of cross-examination or contradiction through the direct examination of Pelullo. During the direct examination, Leonetti testified to extensive dealings with Pelullo such as meetings in his own garage and the friendly relationship between his uncle, the alleged boss of the Philadelphia Mafia, and Pelullo. These were facts that portrayed Pelullo as an associate of the Mafia family, even though Pelullo testified at the first trial that he never met Leonetti.

The record reflects that Count 54 was reproved thoroughly and dramatically, while the other retried counts were not. The other 48 wire fraud counts were proved by routine bank records and corporate documents, together with the explanation of expert witnesses. We are compelled to conclude that the error on Count 54 had a substantial spillover effect on the remaining counts of the indictment. Moreover, we do not find any evidence indicating that the jury was able to overcome the taint such as in *Ivic* where the court found a "discriminating acquittal" on one of the counts, 700 F.2d at 65. The jury convicted Pelullo of all the retried counts.

While we recognize that prejudicial spillover effect can hardly be ascertained with

---

8. There is a serious question of whether the district court impermissibly restricted the ability of the defense in cross-examining the government witnesses called to reprove Count 54. Such restriction may be constitutionally infirm. *See Davis v. Alaska,* 415 U.S. 308, 318–21, 94 S.Ct. 1105, 1111–12, 39 L.Ed.2d 347 (1974). The question is whether the district court's deci-

sion to apply collateral estoppel and to inform the defense that there is "no denyability as to those facts necessarily found by the jury in order to convict on Count 54," Joint App. at 148, is an impermissible restriction. We need not resolve this question since we have concluded that the conviction on the RICO count must be reversed on another ground.

precision, nevertheless, we conclude that the jury was probably influenced by the error on Count 54. When evaluating taint or spillover effect, courts have applied a test somewhat favorable to the defendant. *See Berkery*, 889 F.2d at 1285 ("we cannot say that we are convinced that the jury could not have seized the defendant's admission to Counts 1 and 15 and used those admissions to convict Berkery of Counts 2–14"); *People v. Cepeda*, 851 F.2d 1564, 1568 (9th Cir.1988) ("As we are unable to conclude that this evidence [on an invalid count] did not influence the jury's verdict on the other counts of the indictment, we will order a new trial on all counts."). We believe the prejudicial effect in this case is obvious. Every factor that courts consider under similar circumstances indicates that the jury may have been influenced to the disadvantage of Pelullo. While one might argue that a single factor separately considered may not have produced sufficient prejudice to influence the jury, we believe that all the factors combined caused a strong cumulative effect which resulted in the conviction.

The totality of the circumstances in this case convinces us that the error of Count 54 had a spillover effect sufficiently prejudicial to warrant a new trial for the 48 wire fraud counts. A new trial on all 48 wire fraud counts will be ordered.

## V.

Pelullo challenges the sentences that the district court imposed for the convictions resulting from the retrial, as well as for the conviction on Count 54 resulting from the first trial, which conviction was affirmed by this court in *Pelullo I*. 964 F.2d 193. Because we will reverse the convictions on all counts that were retried, the sentences imposed on those convictions are likewise reversed. Therefore, we need only address Pelullo's contention with respect to Count 54.

■ Initially, Pelullo contends that the district court erred in resentencing him at all on Count 54. His position is that in *Pelullo I* we enumerated certain conditions for resentencing on that count, which never occurred. We disagree.

In *Pelullo I*, we stated that "if Pelullo is not retried or if he is retried and acquitted on one or more of the retried counts, he may be resentenced on count 54." 964 F.2d at 207. We relied on *United States v. Salamone*, 869 F.2d 221, 234 (3d Cir.1989), *vacated on other grounds*, 493 U.S. 1038, 110 S.Ct. 830, 107 L.Ed.2d 826 (1990), which in turn relied upon a footnote in a second case. That footnote stated:

> [The defendant] contends that the evidence presented at trial to convict him on the conspiracy charge was insufficient. The United States has conceded that this is so and consents to vacatur of the conspiracy conviction. The matter must be remanded for resentencing, because we cannot be sure that the sentence for the bank robbery counts was not influenced by the conviction on the conspiracy count.

*United States v. Sebetich*, 776 F.2d 412, 415 n. 2 (3d Cir.1985), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988).

The footnote does not support the position of Pelullo that he cannot be resentenced on Count 54 if he is retried and convicted of all retried counts. The footnote addresses the concern that sentences of the district court usually are influenced by the number of counts and the relationship among the counts. Therefore, the district court should be allowed to resentence if the original sentencing scheme is disturbed on appeal. There is no support in either *Pelullo I* or *Sebetich* for Pelullo's position that he cannot be resentenced on Count 54 after retrial.

■ Pelullo also argues that, even if the district court has the power to resentence him, the district court erred in increasing his sentence on Count 54 to four years of imprisonment following the second trial from a two-year suspended sentence after the first trial.

The increased sentence imposed by the district court presents a fairness question. Courts have recognized that this practice raises the presumption of the trial judge's vindictiveness against a defendant for exercising the right to appeal. Under such circumstances, we have been instructed to require that the district court affirmatively justify any increased sentences. *North Carolina v. Pearce*, 395 U.S. 711, 725–26, 89

S.Ct. 2072, 2080–81, 23 L.Ed.2d 656 (1969). In *Pearce*, the Supreme Court stated:

whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

*Id.* at 726, 89 S.Ct. at 2081. This reasoning was again applied in *Wasman v. United States*, 468 U.S. 559, 564–72, 104 S.Ct. 3217, 3220–25, 82 L.Ed.2d 424 (1984), where the Court affirmed an increased sentence because on the record there was identified legitimate reasons for the increased sentence.

In the present case, the district court did not give any reason for the increased sentence. As a result of the absence of any identifiable reasons, we cannot conduct a meaningful review of the validity of the heightened sentence. We will vacate the district court's resentence on Count 54. On remand, the district court should detail its reasons for any increased sentence when resentencing Pelullo on Count 54.

## VI.

 After the jury rendered its verdict of guilt, the district court conducted a forfeiture proceeding under 18 U.S.C. § 1963(a). The jury returned a special verdict forfeiting $1,854,000 and the Montana ranch. Pelullo contends that the district court erred by instructing the jury that the government's burden of proof in a RICO criminal forfeiture proceeding is a preponderance of the evidence standard.[9]

 Section 1963(a) essentially provides that any person who violates § 1962 shall forfeit to the United States any of his property if the property had a substantial connection with his violation of § 1962. *See* 18 U.S.C. § 1963(a).[10] Therefore, a forfeiture claim contains at least two elements: a violation of § 1962 and a relationship between that violation and the property alleged to be forfeitable. The relationship must show that

9. The government contends that because Pelullo did not object to the jury charge on this issue, our review of this issue is the plain error standard. Under the law of this Circuit, erroneous instruction on burden of proof on an element of the offense or claim is a plain error. *See Government of Virgin Islands v. Smith*, 949 F.2d 677, 686 (3d Cir.1991) (failure to properly instruct the jury on burden of proving self defense); *Beardshall v. Minuteman Press Int'l*, 664 F.2d 23, 26–27 (3d Cir.1981) (failure to provide proper instruction on the burden of proving fraud); *Ratay v. Lincoln Nat'l Life Ins. Co.*, 378 F.2d 209, 212 (3d Cir.) (same), *cert. denied*, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). Furthermore, a recent Supreme Court case has held that constitutionally deficient instruction on the reasonable doubt standard cannot be harmless error because such deficient instruction violated the defendant's right to a jury trial. *Sullivan v. Louisiana*, —— U.S. ——, ——–——, 113 S.Ct. 2078, 2080–2083, 124 L.Ed.2d 182 (1993). *Sullivan* counsels us that we should not lightly assume that there is no prejudice when jury instructions at issue are constitutionally deficient.

10. This section states:

§ 1963. Criminal penalties
(a) Whoever violates any provision of section 1962 of this chapter shall be fined under this title or imprisoned ... or both, and shall forfeit to the United States, irrespective of any provision of State law—
(1) any interest the person has acquired or maintained in violation of section 1962;
(2) any
(A) interest in;
(B) security of;
(C) claim against; or
(D) property or contractual right of any kind affording a source of influence over;
any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of in violation of section 1962; and
(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.
The court, in imposing sentence on such person shall order, in addition to any other sentence imposed pursuant to this section, that the person forfeit to the United States all property described in this subsection. In lieu of a fine otherwise authorized by this section, a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds.
18 U.S.C. § 1963(a) (1988 & Supp. IV 1992).

the property has been used in connection with a violation of § 1962 or is derived from the racketeering activity. *Id.* Obviously any violation of § 1962 must be proved beyond a reasonable doubt. The question, then, is what burden of proof should be placed on the government to prove the relationship between the violation and the property to be forfeited.

Section 1963(a) is a criminal forfeiture mechanism, enacted as a provision for *in personam* criminal penalties. That much is not in dispute.[11] Criminal forfeiture law has deep historical roots in English common law, *see* S.Rept. No. 98–225, 98th Cong., 2d Sess. 193 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3376 ("criminal forfeiture ... has its origins in ancient English common law"), but was disfavored in this country. *See United States v. Cauble,* 706 F.2d 1322, 1345 & nn. 84–85 (5th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). The RICO forfeiture provision appears to be the second piece of criminal forfeiture law that Congress has authorized. *Id.* Subsequently, but in the same year when RICO was passed, Congress provided a similar criminal forfeiture mechanism in the Continuing Criminal Enterprise Act (CCE) (codified as and amended at 21 U.S.C. §§ 848, 853),[12] to combat drug trafficking. Congress did not specify what burden of proof for the government is in either RICO or CCE with respect to the forfeiture claims.

In 1984, Congress enacted the Comprehensive Forfeiture Act of 1984, Pub.L. 98–473, Title II, Ch. III, 98 Stat. 2040, to amend the RICO and CCE forfeiture provisions. With respect to the question of burden of proof, Congress enacted two provisions, but did not provide any explicit guidance on § 1963(a), at issue in this case. With respect to the RICO criminal forfeiture provision, § 302 of the Comprehensive Forfeiture Act added a subsection to § 1963 in order to provide for ancillary proceedings for third parties to claim any interest in the forfeited property, and to specify that the third parties have the burden to prove their interest by a preponderance of the evidence.[13] 98 Stat. 2043–44 (§ 1963(m)). This provision is now codified as § 1963(*l*). With respect to the CCE criminal forfeiture provision, § 303 of the Comprehensive Forfeiture Act created a permissible presumption of forfeitability after the United States establishes its case by a preponderance of the evidence. 98 Stat. 2045–46. This presumption is codified as 21 U.S.C. § 853(d).[14]

By reason of the recent advent of criminal forfeiture laws in the landscape of federal law, neither this court nor any other court of appeals have addressed *in detail* the question of what is the appropriate burden of proof standard in a RICO criminal forfeiture proceeding under 18 U.S.C. § 1963(a), with

---

**11.** For a discussion on the differences between a civil forfeiture and criminal forfeiture, *see United States v. Sandini,* 816 F.2d 869, 872–73 (3d Cir. 1987).

**12.** The CCE was enacted as § 408 of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, 84 Stat. 1265 (1970).

**13.** This provision states in relevant part:

If, after the hearing, the court determines that the [third party] petitioner has established by a preponderance of the evidence that—
(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant ...; or
(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the prop-

erty was subject to forfeiture under this section;
the court shall amend the order of forfeiture in accordance with its determination.
18 U.S.C. § 1963(*l*)(6) (1988).

**14.** This provision states:

(d) Rebuttable Presumption
There is a rebuttable presumption at trial that any property of a person convicted of a felony under this subchapter or subchapter II of this chapter is subject to forfeiture under this section if the United States establishes by a preponderance of the evidence that—
(1) such property was acquired by such person during the period of the violation of this subchapter or subchapter II of this chapter or within a reasonable time after such period; and
(2) there was no likely source for such property other than the violation of this subchapter or subchapter II of this chapter.
21 U.S.C. § 853(d) (1988).

respect to the relationship between the criminal conduct and the property interest to be forfeited.[15] However, courts have applied the beyond a reasonable doubt standard without objection from the government. *E.g., United States v. Ofchinick,* 883 F.2d 1172, 1177 & n. 1 (3d Cir.1989), *cert. denied,* 493 U.S. 1034, 110 S.Ct. 753, 107 L.Ed.2d 769 (1990).

This court has interpreted the CCE criminal forfeiture provision after Congress created the permissible presumption in 21 U.S.C. § 853(d). *United States v. Sandini,* 816 F.2d 869 (3d Cir.1987). In *Sandini,* we held that the beyond a reasonable doubt standard is only constitutionally required with respect to the underlying crime, and that Congress can specify the preponderance of the evidence standard to apply to other aspects of a criminal forfeiture claim brought under CCE. *Id.* at 874–76. The rationale for this holding is that criminal forfeiture is part of the sentence and not a determination of guilt. *Id.* at 875. As a matter of statutory interpretation, the Court further held that Congress provided a preponderance of the evidence standard in the CCE forfeiture provisions, relying on the fact that CCE specifically established a permissible presumption of forfeitability and on Congressional intent expressed in the legislative history of the CCE. *Id.* at 871–72, 874–76. *Accord United States v. Elgersma,* 971 F.2d 690, 692–97 (11th Cir.1992) (in banc).

■ *Sandini* does not decide the issue in this case because the statute at issue there was CCE, not RICO. This court's holding in *Sandini* interpreting the CCE forfeiture provision does not necessarily apply in this case in which we are asked to construe the RICO forfeiture provision, unless it has general applicability regardless of the different statutes involved. *Sandini* is the controlling law in this court with respect to the constitutional component of the issue presented. That is, Congress is not constitutionally required to provide a beyond a reasonable doubt standard in criminal forfeiture proceedings with

respect to the relationship between the underlying crime and the property to be forfeited. This is a holding that would obtain without regard to the particular provisions of the forfeiture statutes being construed.

What Congress is required to provide is, however, different from what Congress actually provided. The standard of proof intended by Congress may vary with the particular statute, or even with different provisions within a statute. This is a question of Congressional intent. In *Sandini,* we found that it was Congress' intent to use a standard lower than the beyond a reasonable doubt standard for the purposes of proving the substantial connection between the underlying criminal conduct and the property to be forfeited. 816 F.2d at 871–72, 875–76. This part of the holding was based on the statutory context and the legislative intent of CCE, *id.,* and has no effect on our interpretation of the RICO forfeiture provision.

The statutory language and legislative history of the CCE are not the same as the language, context and legislative history of § 1963(a). Most important, the CCE rebuttable presumption, 21 U.S.C. § 853(d), which *Sandini,* 816 F.2d at 871–72, and *Elgersma,* 971 F.2d at 694–95, rely upon to reach the conclusion that the preponderance of the evidence standard applies in CCE criminal forfeiture proceedings, does *not* exist in the RICO forfeiture provisions. The question for us to decide today is what standard of proof Congress intended to apply in the RICO criminal forfeiture proceedings under § 1963(a) with respect to the relationship between § 1962 violations and the property to be forfeited.

■ Our effort to discover Congressional intent must begin with the language of the statute. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("[t]he task of resolving the dispute over the meaning of [a statute] must begin ... with the language of

---

15. *Cf. United States v. Ginsburg,* 773 F.2d 798, 803 (7th Cir.1985) (in banc), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986) ("nothing in the plain language or the legislative history of section 1963(a)(1) imposes on the gov-

ernment the burden of proving that the proceeds of racketeering activity are still in existence a[t] the time of a defendant's conviction before the government can obtain a forfeiture of those proceeds under RICO").

the statute itself"); *Government of the Virgin Islands v. Knight,* 989 F.2d 619, 633 (3d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 556, 126 L.Ed.2d 457 (1993). *Cf.* Monaghan, *Our Perfect Constitution,* 56 N.Y.U.L.Rev. at 377 ("the language of the [C]onstitution ... constitutes the best evidence of original intention"). Section 1963(a), however, is silent as to the burden of proof standard. Therefore, we examine the statutory context and legislative history for guidance. *See Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) ("[where] resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear"); *Electronic Lab. Supply Co. v. Cullen,* 977 F.2d 798, 802–05 (3d Cir. 1992). Taking all available data into consideration, we conclude that Congress intended the higher beyond a reasonable doubt standard to apply.

When the criminal forfeiture provisions were enacted in 1970, the general understanding was that a criminal forfeiture claim, which consists of the underlying illegal conduct and the nexus between that conduct and the property to be forfeited, is similar to a substantive criminal charge and proved like any other criminal charge. For the express purpose of implementing the criminal forfeiture provisions of both RICO and CCE, the Supreme Court amended the Federal Rules of Criminal Procedure in 1972 to require that a criminal forfeiture claim be alleged in the indictment or information and a special verdict of forfeiture be rendered by the jury. *See* Fed.R.Crim.P. 7(c)(2), 31(e) and the 1972 Amend. Adv. Comm. Notes thereto. The Advisory Committee Note to Rule 31(e) states that "[t]he assumption of the draft is that the amount of the interest or property subject to criminal forfeiture is an element of the offense to be alleged and proved." These requirements in the Federal Rules of Criminal Procedure permit a natural inference that the government's burden of proof is beyond a reasonable doubt standard.[16]

The government itself understood its burden of proof to be beyond a reasonable doubt in RICO criminal forfeiture proceedings. The Criminal Division of the Department of Justice stated in *Racketeer Influenced and Corrupt Organizations (RICO): A Manual for Federal Prosecutors* (Aug.1985), which was intended to "provide guidance to federal prosecutors in applying the RICO statute in criminal cases," *id.* at i (preface), that "[t]he jury must be convinced beyond a reasonable doubt of the relationship between the property interest to be forfeited and the RICO violation." *Id.* at 82.[17]

Against the background of such a general understanding, Congress in one single act amended both RICO and the CCE by specifi-

---

**16.** These rules and Advisory Committee notes have been discounted in cases addressing the burden of proof in CCE criminal forfeiture proceedings. In *Sandini,* 816 F.2d at 875 n. 7, we pointed out that the Advisory Committee Note to Rule 31(e) "set forth only an assumption." The *Elgersma* court, in disregarding the Advisory Committee Note to Rule 31(e), relied on the fact that the note was written prior to 1984 when Congress added the rebuttable presumption to the CCE forfeiture provisions. 971 F.2d at 693. There is a question whether providing a rebuttable presumption is *necessarily* equivalent to providing a preponderance standard. For example, certain permissible presumptions are allowed in proving a substantive criminal offense, but it would be incorrect to state that by virtue of that presumption, the burden of proof on the government with respect to the substantive offense is a preponderance of the evidence. *See, e.g., County Court of Ulster County v. Allen,* 442 U.S. 140, 154–67, 99 S.Ct. 2213, 2223–30, 60 L.Ed.2d 777 (1979). In any event, these cases do not address the burden of proof for RICO criminal forfeiture proceedings. Furthermore, Congress cited Rules 31(e) and 32(b)(2) approvingly when amending

the criminal forfeiture provisions in both RICO and CCE. *See* S.Rept. No. 98–225, *supra,* at 193–94 & n. 15, *reprinted in* 1984 U.S.C.C.A.N. at 3376–77 & n. 15.

**17.** The Department of Justice apparently did not modify its position until August 1988, when it revised its manual. A supplement styled as "1988–2 Supplement" contains the same "beyond a reasonable doubt" language as quoted in the text of this opinion. Selected provisions in this supplement were reprinted in PLI, *Civil RICO 1990* (PLI Course Handbook Series No. 155 (Litigation and Administrative Practice Series)) at 209. But the August 1988 second revised edition states:

> Courts have provided differing opinions as to the burden of proof the government must sustain in a forfeiture proceeding. One court has held that, since forfeiture is a criminal penalty and not an element of the crime, a preponderance of the evidence is the appropriate standard. Other courts have held the government to a reasonable doubt standard of proof in the forfeiture proceedings. In light of this division

cally providing a preponderance of the evidence burden of proof with respect to CCE criminal forfeiture proceedings and certain aspects of RICO, but left § 1963(a) undisturbed. *See* Comprehensive Forfeiture Act of 1984, Pub.L. 98–473, Title II, Ch. III, §§ 302, 303, 98 Stat. 2044–46. This indicates that Congress intended the higher beyond a reasonable doubt standard to control in a § 1963(a) proceeding. If Congress wanted a preponderance standard for § 1963(a), it would have so stated as it specifically did for CCE.

As related above, one of the amendments to the RICO forfeiture provisions specifies that in third party ancillary proceedings, a third party claimant of property interest has the burden of proving his or her interest by a preponderance of the evidence. *See* the Comprehensive Forfeiture Act, § 302, 98 Stat. 2044 (codified as 18 U.S.C. § 1963(*l*)(6)). It is inconceivable that Congress intended a preponderance standard for § 1963(a) claims, without specifically providing it, while it went through the trouble of specifying that third parties claiming interests in the property to be forfeited have the burden to prove their interest by a preponderance of the evidence. This difference in language within the same section of the statute "invited the inference that the reasonable doubt standard should be employed throughout a RICO proceeding except where there is explicit provision otherwise." *United States v. Pryba*, 674 F.Supp. 1518, 1521 (E.D.Va. 1987), *aff'd*, 900 F.2d 748, 758 (4th Cir.1990), *cert. denied*, 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990).

Equally illuminating is the amendment to the CCE criminal forfeiture provision, which is "identical to the RICO criminal forfeiture statute." S.Rept. No. 98–225, *supra*, at 209, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3392. Congress noted that "it is often difficult to produce direct evidence that particular property of a defendant constitutes, or was purchased with, such proceeds [from drug trans-

actions]." *Id.* at 212, *reprinted in* 1984 U.S.C.C.A.N. at 3395. Thus, Congress created a permissible presumption of forfeitability after the United States proves its case by a preponderance of the evidence. *Id.;* 98 Stat. 2045–46. This presumption is now codified as 21 U.S.C. § 853(d).[18] The provision of this presumption and its accompanying legislative history convinced this court that Congress intended that a lower standard of proof apply in § 853(d) proceedings. *See Sandini*, 816 F.2d at 874–76.

It is clear that in the same legislation amending both RICO and CCE, Congress realized that the existing standard of proof in criminal forfeiture proceedings was severe for the government, but acted to make it easier for the government only in CCE forfeiture proceedings, not RICO forfeiture proceedings. This fact favors the view that Congress intended the beyond a reasonable doubt standard to apply in § 1963(a) proceedings and that a somewhat different standard apply in CCE forfeiture proceedings under 21 U.S.C. § 853.

Finally, in a Senate Report accompanying the Comprehensive Forfeiture Act adding the burden of proof provisions discussed above, Congress actually stated when commenting on the burden of proof of third parties in ancillary proceedings, that "[s]ince the United States will have already proven its forfeiture allegations in the criminal case beyond a reasonable doubt, the burden of proof at the [ancillary] hearing will be on the third party." S.Rept. 98–225, *supra*, at 209, *reprinted in* 1984 U.S.C.C.A.N. at 3392. This statement evidenced the presumption and intent of Congress that the beyond a reasonable doubt standard was meant to apply in § 1963(a) proceedings. This is all the more convincing when the statement is read in the context of the relevant legislation on burden of proof.

Furthermore, the Senate Report indicated that Congress agreed with the Federal Rules

of authority, the safest approach for the prosecutor is to apply the reasonable doubt standard in preparing for a forfeiture proceeding. Department of Justice, Criminal Division, *Racketeer Influenced and Corrupt Organizations (RICO): A Manual for Federal Prosecutors* 105–06 (2d rev. ed., Aug. 1988) (citations omitted). The Department of Justice cited this Court's *San-*

*dini* case to support the modification of its position. *Id.* at 105 n. 212. We do not believe that the holding in *Sandini*, a case on the interpretation of CCE, should be applied in a RICO criminal forfeiture case.

**18.** For the text of the presumption, *see supra* note 14.

of Criminal Procedure requiring that forfeiture claims be alleged in the indictment or information, and that the jury render a verdict. *See* S.Rept. No. 98–225, *supra*, at 193–94 & n. 15, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3376–77 & n. 15 (citing with approval Fed.R.Crim.P. 31(e), 32(b)(2)). Strictly speaking, this Senate Report is subsequent legislative history, but it is a significant indication of Congressional understanding of the question because Congress made these statements in the context of amending the statute for the purpose of specifying a burden of proof standard for other sections of the forfeiture statutes, while leaving the original RICO criminal forfeiture provision undisturbed.

These sources present a strong argument that Congress intended the higher beyond a reasonable doubt standard to apply in RICO criminal forfeiture proceedings. This conclusion is in accord with current judicial understanding stated in dicta, *see, e.g., United States v. Pryba*, 674 F.Supp. 1518, 1519–21 (E.D.Va.1987), *aff'd*, 900 F.2d 748 (4th Cir.), *cert. denied*, 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990); *United States v. Horak*, 633 F.Supp. 190, 199–200 (N.D.Ill.1986), *aff'd in part, vacated in part*, 833 F.2d 1235 (7th Cir.1987), with academic comments, *see, e.g.,* Mary M. Cheh, *Constitutional Limits on Using Civil Remedies to Achieve Criminal Law Objectives: Understanding and Transcending the Criminal–Civil Law Distinction,* 42 Hastings L.J. 1325, 1340 (1991), and with standard jury instructions authored by a well-respected district judge, *see* 2 Leonard Sand *et al., Modern Federal Jury Instructions,* ¶ 52.06 at 52–58 (1993) ("the government must prove, beyond a reasonable doubt, that the property was derived from the defendant's racketeering activity").

In light of the above analysis, we conclude that Congress intended the burden of proof in a § 1963(a) proceeding to be beyond a reasonable doubt. The verdict of forfeiture in this case was rendered under an invalid jury instruction that the burden of proof is preponderance of the evidence and must be reversed. On remand, the district court shall apply the standard we announce today.

## VII.

Pelullo moved prior to retrial to dismiss the indictment, asserting the government searched and seized his confidential files which were within the protection afforded by the attorney-client privilege. He argues that the files contained confidential documents prepared by himself and his attorneys for use at the first trial and the appeal of this matter.

Following an evidentiary hearing, the district court concluded that the attorney-client privilege had been waived by Pelullo. In addition, the district court noted that all government attorneys and agents assigned to this case signed affidavits verifying that at no time did they see or otherwise have access to any of the information that Pelullo claimed to be privileged. Thus, the district court concluded that the Sixth Amendment rights of Pelullo were not violated. *United States v. Pelullo*, D.C.Crim. No. 91–00060, 1993 WL 216127 (E.D.Pa. June 18, 1993), at *12.

Although Pelullo vigorously contends that he never intended to waive his attorney-client privilege, he does not object to the finding of the district court that the government attorneys and agents working on this case have not been exposed to any privileged information. We, therefore, agree with the district court that any alleged violation of attorney-client privilege has not been prejudicial to Pelullo under the circumstances of this case. We need not address whether the privilege has in fact been waived, nor do we endorse the reasoning of the district court underlying its waiver theory.

## VIII.

The district court filed a memorandum opinion on June 18, 1993, *see id.,* three months after it entered final judgment, one month after Pelullo filed his opening brief before this court, and eight days after the government filed its answering brief. Pelullo contends that it was grossly improper for the district court to file the thirty-page memorandum opinion after the appeal process was well under way before the court of appeals. He requests that we direct a reassignment of the case if a remand is ordered. We will deny this request.

Generally, the filing of a notice of appeal divests the district court of jurisdiction, but

we appear to have permitted such a memorandum to assist the appellate process. *See United States v. Lafko,* 520 F.2d 622, 627 (3d Cir.1975) ("During the pendency of the appeal the District Court retains only the limited authority to take any steps that will assist the Court of Appeals in its determination."); *cf.* Fed.R.App.P. 10(e) (the district court under certain circumstances may augment the record); Third Circuit LAR 3.1 (1993) ("Within 15 days [of the filing of notice of appeal], the trial judge may file . . . a written opinion or a written amplification of a prior written or oral recorded ruling or opinion."). We observe that the memorandum did not have any substantive effect on the case. The district court made no new ruling, and its memorandum merely stated the factual and legal bases for its previous decision. The district court's action in this case appears to fall within this exception.

We do not believe that the late filing of the district court memorandum, alone, constitutes sufficient evidence of partiality or the appearance of partiality to warrant a reassignment. *See Haines v. Liggett Group, Inc.,* 975 F.2d 81, 98 (3d Cir.1992) ("the polestar is impartiality and the appearance of impartiality" (internal quotation marks and citation omitted)). We will deny Pelullo's request for reassignment of the case on remand, since we perceive no indication of partiality.

We take this opportunity, however, to observe that the preferred practice is for the district court to file any memorandum opinions before or concurrent with its final judgment. Exigent circumstances may justify a late memorandum, but delayed filing may raise suspicions of partiality. Unquestionably, the better and preferred practice is prompt filing.

### IX.

Pelullo also contends that the district court erred in admitting hearsay evidence, and there was insufficient evidence to sustain the verdict of the jury. In light of our decision, we need not entertain these arguments.

### X.

For the foregoing reasons, we will reverse the district court's judgment, the sentences and forfeiture imposed on Pelullo. We will also vacate the resentence on Count 54. We clarify that we deny Pelullo's requests for a new trial on Count 54, for dismissal of the indictment, as well as for reassignment of the case. This case will be remanded to the district court for further proceedings consistent with this opinion.

### SUR PETITION FOR REHEARING

March 22, 1994

Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ROTH, and LEWIS, Circuit Judges.

The petition for rehearing filed by appellee having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.